# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### JANUARY 1999 SESSION

FILED

June 17, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| MICHAEL LEE MCCORMICK, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 03C01-9802-CR-00052 |
| | ) | |
| vs. | ) | Hamilton County |
| | ) | |
| STATE OF TENNESSEE, | ) | Honorable John K. Byers, |
| | ) | Sitting by Designation |
| Appellant. | ) | |
| | ) | (Post-Conviction - First Degree |
| | ) | Murder - Death Penalty) |
| | ) | |

**FOR THE APPELLEE:**

**T. MAXFIELD BAHNER**
1000 Tallan Building
Two Union Square
Chattanooga, TN 37402

**MICHAEL E. RICHARDSON**
202 Market Court
Chattanooga, TN 37402

**FOR THE APPELLANT:**

**JOHN KNOX WALKUP**
Attorney General & Reporter

**MICHAEL E. MOORE**
Solicitor General

**DON UNGURAIT (at hearing)**
Deputy Attorney General
450 James Robertson Parkway
Nashville, TN 37243

**KENNETH W. RUCKER (on appeal)**
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

**WILLIAM H. COX, III**
District Attorney General

**JOSEPH A. REHYANSKI**
Asst. District Attorney General
600 Market Street - Court Bldg.
Chattanooga, TN 37402

OPINION FILED: _____

**AFFIRMED**

**JAMES CURWOOD WITT, JR., JUDGE**

# OPINION

The State of Tennessee appeals the Hamilton County Criminal Court's grant of post-conviction relief to the petitioner, Michael Lee McCormick. In 1987, a Hamilton County jury convicted the petitioner of the 1985 first degree murder of Donna Jean Nichols. The jury imposed the death penalty based upon its finding that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant. See Tenn. Code Ann. §39-2-203(I)(6) (1982) (repealed 1989). The conviction and sentence were affirmed by the Tennessee Supreme Court in State v. McCormick, 778 S.W.2d 48 (Tenn. 1989). On May 20, 1990, the petitioner filed the petition for post-conviction relief presently under review. After an evidentiary hearing, the post-conviction court ordered a new trial based upon its findings that the petitioner had received ineffective assistance of counsel in both the guilt and penalty phases of the trial. On appeal, the state raises the following issues:

> 1. Whether the lower court erred in finding that trial counsel inadequately investigated potential witnesses and that any such inadequacy prejudiced the defendant.
>
> 2. Whether the lower court erred in finding that the defendant received ineffective assistance of counsel at the sentencing phase of the trial and that any such ineffective assistance prejudiced the petitioner.
>
> 3. Whether some of the claims of the petitioner have been waived.

After oral argument of the issues, review of the parties' briefs and the law, and review of the record, we affirm the action of the post-conviction court.

## I. Facts of the Murder Case.

The facts of the murder case are set forth in the following excerpt from the Supreme Court's direct-appeal opinion:

> At about 2:00 a.m. Thursday, February 14, 1985, the body of the victim was discovered in a parking area along Brainerd Road in Chattanooga.

2

. . .

Two head wounds were apparent, as well as one on the hand.

. . .

An autopsy later that morning showed that Jeanie Nichols had been shot at very close range.

. . .

At 4:46 a.m. the [victim's] car was found in an auto service parking lot that was frequently used by customers of the adjacent Beach Club, a singles' night spot.

. . .

Faint smudges of blood stained the covers of the front seats, and a thick film of blood covered the frame and exterior panel below the passenger door.

. . .

The victim was at home until approximately 9:30 on the night of the 13th. At 9:45 she met a man she dated frequently, [Dewayne Hines,] and they had drinks at Merv's restaurant. When they separated at 11:30, Jeanie Nichols was driving the car later found near the Beach Club. She announced she was going to "hit" Brainerd Road, by which her companion understood she planned to visit various night spots in the area.

. . .

Defendant was a friend of Nichols' younger brother Hap, with whom she shared an apartment in their grandmother's home.

. . .

The two men regularly consumed drugs together and had committed a burglary at [a Georgia] college and stolen electronic equipment. When the victim completed her pharmacy degree and moved to Chattanooga in 1984, she discovered these activities and McCormick's identity. She insisted that the stolen equipment be moved from the house and that her brother end his association with Defendant. Hap Nichols related all this to Defendant at the time, as McCormick later admitted, and he removed the equipment. According to family members, Jeanie was very proud of her career, had worked her way through school, and had undertaken to straighten out her brother's life.

. . .

It was also learned that Defendant had visited at the home of a former girlfriend, near his parents' home, from 9:30 to 11:10 p.m. on February 13. He was driving his employer's red truck, and he left saying it was too early to go home. This witness reported that Defendant was intoxicated and behaved in a bizarre fashion and he spent some time removing something he had hidden under her house. At this point McCormick was questioned by Detective Dudley of the Chattanooga Police Department.

. . .

He said he had met a childhood friend at Bennigan's on the evening of February 13. They had a few drinks and left in separate vehicles for the Brainerd Beach Club. He had left the Beach Club at 11:00 or 11:30 p.m. and gone straight to his parents' home, where he lived.

. . .

Defendant consented to the gathering of samples of hair, saliva, etc. and to a search of his house and vehicles. With one exception, nothing of interest was found. A hair collected from the interior of the victim's car was determined to have features similar to his, and could have come from the Defendant.

. . .

Shortly after this interview and search, Defendant left town and spent some time in Arizona. He returned, was convicted of the college burglary, and served a sentence followed by parole.

. . .

McCormick and the victim had been seen together. An employee of the Revco Drug Store, where Jeanie Nichols worked at the time of her death,

[Donna Lawson,] testified she and the victim had gone out together during this time. She reported three disturbing encounters she witnessed between Nichols and McCormick during the three weeks before the murder. Twice he had come to the pharmacy counter with another man and engaged the victim in conversation. On February 7 he and another man had approached her at a bar, and they talked privately for a long time. Each of these conversations left the normally talkative and cheerful victim in a depressed mood.

Almost two years after the murder, January 21, 1987, Chattanooga Police arranged for Defendant to meet Eddie Cooper in a Georgia parole office. Cooper was an undercover officer posing as a parolee. The two moved into a motel apartment together and over the next four weeks Cooper gained Defendant's confidence and included him in several purported transfers of stolen cars.

Early on, Defendant asked if they needed to go armed in these transactions and said he had a .45 calibre handgun. He conversed about murderers he had met in prison and professed to know about contract murder, but he made no mention of the Nichols killing. Cooper then hinted he had been offered twenty thousand dollars to perform a murder in Knoxville.

On February 9, Detective Dudley staged the arrest of a customer in a bar in the presence of the Defendant and Cooper, and he spoke to Defendant. Defendant was visibly shaken. Cooper demanded to know whether Defendant was under suspicion, in light of their mutual illegal activities. Defendant explained about the burglary conviction and the murder investigation. Over the next few days Cooper pursued the subject, ostensibly concerned about their safety and Defendant's trustworthiness. When asked why anyone would kill a woman, Defendant replied, "For instance, a woman knew more about you than you wanted them to know, possibly enough that would put you in the penitentiary. . . There's some things you just don't tell on yourself." He claimed he had refused one thousand dollars to kill Jeanie Nichols, but he knew the murderer. According to him the motive related to the drug inventory at her place of employment and she "was going to spill her guts." Defendant also said Nichols had been shot three times with a 9 mm or .45 calibre weapon, once in the temple, once behind the ear, and once in the hand. He stated the gun "wasn't two inches from her head." Later he said he did not know why she had been killed.
. . .

On February 17, 1987, the Defendant unexpectedly began to confess to Nichols' murder. Cooper managed to record the conversation, which was played for the jury along with several previous conversations. Defendant said that he had killed Nichols but not for $1,000.00. Supposedly, she was "holding out" some drugs. He claimed that he had killed her "over some money" and said he had been paid $3,500.00 but did not name who had paid him. He and Nichols had met at the Beach Club and left together. He had then killed her, dumped her body in Eastgate, parked her car at an automatic transmission business near the Beach Club, and driven away in his van.
. . .

Defendant's parents testified that . . . he had come home that evening between 11:00 and 11:30 p.m. Shortly thereafter he went out again for a few minutes but did not take a vehicle. He returned around 12:10 a.m. and remained with his mother in the living room from 1:00 to 2:00 a.m., and he retired at 3:00 a.m.

At the sentencing phase the State presented no further proof. In mitigation, Defendant's father described his son's serious drinking problem, which had begun at age 14 or 15. It became worse, and was complicated by marijuana use, after his discharge from the Air Force in 1974. He had twice entered treatment programs, but in 1984 when he returned home after his divorce, the drinking had become constant. Defendant's alcoholism was corroborated by the trial testimony of various acquaintances. In addition, counsel argued Defendant had no significant criminal history. T.C.A. 39-2-

203(j)(1), (8).

McCormick, 778 S.W.2d at 49-52.

On this evidence, McCormick was convicted of first degree murder and sentenced to death.

## II. **Facts of the Post-Conviction Hearing.**

### a.

At the post-conviction hearing, Rodney Strong, one of the petitioner's trial attorneys, testified that he had practiced law since 1978 and had participated in several murder trials and four or five capital cases by the time of the petitioner's trial. Strong and his co-counsel, Paul Bergmann, investigated the case themselves by obtaining personal history from the defendant and by interviewing a number of witnesses. They did not petition the court for state funds to compensate an investigator or for expert services. Counsel determined that there was no need for expert psychological testimony after becoming acquainted with the petitioner and discussing the petitioner's case with Ken Stallings, a mental health counselor who had counseled the defendant for a substance abuse problem.

Counsel's bill for compensation reflected that Strong spent 22.8 hours investigating the case. Counsel filed a motion to suppress the defendant's pre-trial statements. Once the trial court overruled the motion to suppress the undercover tapes made by Cooper, the defense strategy was to show that the defendant's statements to Cooper that he had killed the victim were manifestations of his propensity to lie about his deeds and experiences. The defense relied upon the lack of physical evidence that tied the defendant to the murder and upon the defendant's mother's testimony that the defendant was home at the time the crime was committed.

5

At trial, the defense tried to show that the petitioner had a reputation for lying and was known to claim falsely that he had fought in the war in Vietnam. The defense also relied upon the petitioner's history of being dependent on alcohol to support the claim that the inculpative statements given to the undercover agent were made merely to curry favor with the agent, who was providing a temporary residence for the petitioner.

One of the state's witnesses at the trial of the case, Donna Lawson, testified that prior to the night the victim was killed, she had seen the victim and the petitioner conversing three times. Twice Lawson saw the two talking in the Revco store where Lawson and the victim worked, and the week before the shooting, she saw them talking in a night club. In his post-conviction hearing testimony, Strong acknowledged that Lawson had been a former client of his and that, based upon this representation, he knew she had previously pleaded guilty to felony bad check charges. At trial, counsel declined to use the prior admission or convictions to impeach Lawson's testimony.

Strong testified that he tried to develop proof at trial to suggest that a boyfriend of the victim, David Shore, was a jealous individual and that at the time of her death, the victim was dating another man, Dewayne Hines. The victim and Hines had been seen together at an establishment called Merv's on the night of February 13, 1985.

Counsel did not investigate the whereabouts of Dewayne Hines after he left Merv's on February 13, nor did they investigate the whereabouts of David Shore that night. Counsel did not talk to any of the employees of the Brainerd Beach Club nor check charge slips to ascertain identities of customers that were served at the Brainerd Beach Club on the night of February 13 or early morning hours of February 14.

6

The only physical evidence which the prosecution used in the trial was a hair found in the victim's automobile which contained properties similar to a strand of the petitioner's hair. The defense did not attempt to obtain independent analysis of the hair, nor did it attempt to obtain independent analysis of the clothes worn by the petitioner on the night of February 13-14. The defense did not attempt to obtain the victim's fingernail scrapings once the prosecutor informed counsel that the tests on the scrapings were "negative." Through the pre-trial statement of the petitioner's that was taken by Officer Dudley prior to the undercover operation, the trial evidence showed that the defendant admitted to drug and alcohol use and to various criminal convictions, including indecent exposure. Defense counsel did not object to these portions of the statement being admitted into evidence because they wished to demonstrate the petitioner's problem with alcohol and that he had persisted in denying his involvement in the victim's murder despite the withering interrogative tactics of Dudley.

Defense counsel was aware prior to trial that Jeff Bowen, a security guard at the Brainerd Beach Club, saw a "girl who looked like Nichols and was dressed like Nichols leave with an unidentified male." Counsel elected not to pursue this information and did not call Bowen to testify at trial. Counsel had no recollection of a composite drawing of the man who Bowen saw leave the club with the victim on the night of February 13-14, although Bowen's statement and a copy of the drawing apparently were given to defense counsel during discovery. Strong opined, upon seeing the composite drawing for the first time at the post-conviction hearing, that had the figure in the drawing been given a beard, it would have resembled the petitioner's likeness. Strong recounted his belief that had the jury concluded the man meeting Bowen's description was the petitioner, then Bowen's testimony would be the only trial testimony to put the petitioner in the victim's presence on the night of her death.

The guilt phase of the trial concluded with a verdict of guilty of first

7

degree murder at approximately 5:00 p.m. on Saturday afternoon, and the trial court proceeded with the sentencing phase of the trial on Saturday evening. The defense relied upon the trial testimony of Ralph Lindsay, which supported the fact that the petitioner had an alcohol problem, and upon the testimony of the petitioner's father. The petitioner did not testify in either phase of the trial. No expert witnesses were used in either phase of the trial.

Paul Bergmann, Strong's co-counsel, did not recall much of counsel's trial preparation activities. He testified that counsel either talked or attempted to talk to all of the witnesses whose names had been given them by the defendant and his family and all of the witnesses named on the state's witness lists. Bergmann spent a total of 42.1 hours investigating the case and interviewing witnesses. He did not recall that either himself or Strong had interviewed Jeff Bowen. Specifically, he did not recall interviewing Jeff Bowen, reading Bowen's statement given to the police, or previously seeing the composite drawing made from Bowen's description of the man who allegedly accompanied the victim as she left the Brainerd Beach Club. Bergmann acknowledged that the petitioner had a full beard at the time of the homicide, whereas the figure in the Bowen drawing was clean-shaven except for a mustache.

Bergmann acknowledged that the "pathology" of lying might be an issue that required specialized knowledge within Tennessee Rules of Evidence 702 and 703.

**b.**

Jeff Bowen testified at the post-conviction hearing that the police asked him to view the victim's body at the hospital for purposes of identification. Based upon her distinctive clothing, he identified her as the woman he saw leaving the Brainerd Beach Club several hours earlier in the company of a man who was immaculately dressed in coat and tie. Bowen described the man as being neatly groomed, clean-shaven except for possibly a mustache, "one of those guys that

8

looks like his shirt was starched and the whole shot, so I mean he was sharp."
Bowen did not specify the time when the couple departed. He had no recollection
of being contacted by defense counsel. He further testified that the man he saw
with the victim did not resemble the photograph of the petitioner which was taken
a few days after the homicide.

## c.

At the post-conviction hearing, the petitioner called William L. Curtis,
a private investigator who had formerly served as an FBI special agent. Curtis
conducted an investigation of the homicide as part of the petitioner's preparation for
his post-conviction hearing, and in the course of the investigation, Curtis interviewed
a number of persons. With the assent of the court and the state,[1] Curtis was
allowed to testify what various persons had said in their interviews with him. Many
of these persons were subpoenaed and available to testify, and the testimony of
Curtis was apparently used by stipulation as a device for abbreviating the hearing.
In this vein, Curtis summarized several interviews, chief among which are the
following:

1. Clarence Parton was manager of the Revco in
Chattanooga where the victim worked as a pharmacist in 1985.
Lawson was also an employee of this store, and Parton said
that Lawson's credibility was suspect and that she was
ultimately fired for taking merchandise from the store.

2. Barbara Tallent worked at the Revco and indicated
that she had never seen the petitioner in the store talking to
the victim, as Lawson had testified, but she had seen Dewayne
Hines in the store talking with the victim. Tallent did not
believe that Lawson was a credible individual.

---

[1]Upon the petitioner requesting that Curtis be allowed to summarize
his interviews, the state announced, "My agreement with Mr. Richardson . . . is I
have no objection to Mr. Curtis, subject to [the court's] approval, summarizing
and presenting what is obviously blatant hearsay in order to expedite matters."

3.  Dick Dangler was the Revco security manager who said that the victim's keys to the store were never recovered.

4.  Susie Wilson was a bartender at the Brainerd Beach Club who recognized the photograph of Dewayne Hines and said that he was a regular at the club in February of 1985. She did not recognize the photograph of the defendant.

5.  Jane McDonald was a customer at the Brainerd Beach Club on the night of February 13, 1985 and saw the victim coming into the club accompanied by two men. She did not recognize the two men and did not connect either of them to the photograph of the petitioner.

6.  Dana Sokohl, an acquaintance of the victim's, examined a composite picture that had been drawn to the specifications of a woman named Joyce Mahn. The composite picture was allegedly meant to depict a man that Mahn saw in the Brainerd Beach Club parking lot on the night of February 13. Sokohl told Curtis that the man in the picture looked like David Shore, the former fiancé of the victim.

None of the potential witnesses identified above had been interviewed by defense counsel prior to the trial.

**d.**

Doctor Gillian Blair, a clinical psychologist, testified at the post-conviction hearing that the petitioner had psychiatric hospitalizations prior to the victim's murder and in the past had been diagnosed with psychosis. He had a long history of chronic dependence on alcohol which probably contributed to the previous finding of psychosis. The petitioner had a chronic need to bolster his self image by telling fantastic lies about himself and persisting in these lies even in the face of hard evidence to the contrary. Doctor Blair opined that a previous diagnosis of post-

traumatic stress disorder was incorrect and without foundation. After administering a battery of tests to the petitioner, she determined that his full scale IQ was in the high average range. He had no organic damage and was neither psychotic nor sociopathic. He had no manic depressive disorder, was not delusional nor paranoid, but he may have suffered from a bipolar disorder or cyclothymia. She found that he was hypomanic and that he exhibited extreme anxiety and agitation, pressured speech, distractibility, and flight of ideas. The petitioner had a negative view of himself and pursued an extremely strong need for acceptance and approval from others. She opined that his propensity to lie stemmed from this need but that the trait itself did not indicate a disorder and did not require specialized expertise to understand. Blair opined that the defendant could be vulnerable to coercion or manipulation in making false statements.

**e.**

Debra Boggs, the petitioner's ex-wife, testified that he was a great husband and father when he was not drinking. When he was in periods of sobriety, he was always helping other people, serving on the volunteer fire department, and volunteering for the Boy Scouts. He had rescued a drowning girl from a swimming pool and revived a heart attack victim by administering cardio- pulmonary resuscitation. She admitted that the petitioner was a different individual when he was drinking and that he had once threatened her life and had assaulted her on a few occasions.

**f.**

John Kilborn, a forensic scientist with a specialty in the analysis of hair samples, testified that the FBI specialist testified inaccurately at the trial when he said that properties of the petitioner's hair sample were similar to "unique" properties of a hair found in the victim's car. Kilborn testified that hair could not serve as the basis of positive identification as in the case of DNA evidence or fingerprints and that the hair segment found in the victim's vehicle, although it had properties similar to the petitioner's hair sample, could not serve as a reliable basis for comparison

11

because it was not a full hair strand.

**g.**

Several witnesses appeared at the post-conviction hearing to testify that the petitioner had an alcohol problem and that he was never known to be violent.

**h.**

The petitioner testified at the hearing that he had submitted a long list of names of possible witnesses to counsel, but only his parents and Ralph Lindsay testified for the defense at trial. He complained that prior to trial he had difficulty contacting his attorneys from the jail. He did not know that he could have petitioned for state funds for expert and investigator assistance until he began his post-conviction proceeding. He only met with Ken Stallings one time. He was not aware of Jeff Bowen prior to trial. He acknowledged that he elected not to testify at the trial. He maintained that he did not know the trial would consist of two phases, nor that he had a right to testify at the penalty phase even if he had not testified during the guilt phase.

**I.**

Charles Fels, a Knoxville lawyer, testified as an expert on the range of competence for counsel under the Sixth Amendment. Generally, he opined that counsel in a capital case is obliged to interview all of the state's witnesses, to investigate the defendant's background, education, and medical, psychological and military history, and to examine scientific reports and independently investigate the accuracy of expert findings. He found the total hours reported for interviewing witnesses to be very minimal. He highlighted the failure of counsel to use the composite picture that was based upon Bowen's description and the failure to uncover Jane McDonald's knowledge that the victim entered the Brainard Beach

12

Club in the presence of two men, neither of whom were the petitioner. Fels opined that the hair analysis should have been attacked along the same lines as John Kilborn's post-conviction testimony. Further, he opined that trial counsel was remiss in not seeking independent forensic analysis of the victim's fingernail scrapings and the defendant's clothing. Fels opined that the number of pre-trial motions were minimal and that the issues raised in the motion for new trial were limited and too general. He was particularly critical of counsel's failure to file motions in limine in order to redact from petitioner's various pre-trial statements a number of damaging revelations that were not probative of the issues on trial. He cited counsel's failure to object to various other components of evidence and to comments made by the prosecutor during the closing arguments. Finally, he opined that trial counsel's performance during the penalty phase was deficient because psychological evidence had not been adequately explored.

**j.**

At the post-conviction hearing, the state called Dr. John Spencer, a clinical and forensic psychologist, who testified that although the petitioner was antisocial, he was not psychotic, had no organic brain damage, and is intelligent. Doctor Spencer opined there was no basis for referring the case to an expert in the field of false confessions and that a lay witness' anecdotal information about the petitioner's lying was more significant evidence than could be offered by an expert witness. "Pathological liar" is not a diagnostic category but merely a description of people who are often antisocial and who lie frequently.

### III. Post-conviction Court's Findings.

Based upon the evidence, much of which is summarized above, the post-conviction court sustained the petition in the following particulars:

1. Counsel's representation was prejudicially deficient
in failing to develop and use the information supplied by Jeff
Bowen, including the composite drawing. The post-conviction
court found that the Bowen evidence "would have been highly

13

beneficial to the defense theory," especially "where the case contained little to no physical evidence against the defendant."

2. Counsel's investigation was prejudicially deficient in the failure to interview other employees from the Brainard Beach Club and other witnesses "who may have seen the victim on the night of the murder with someone other than the defendant."

3. Counsel was deficient in failing to develop mitigation evidence from lay witnesses for use at the sentencing hearing.

4. Although standing alone, the failure to use psychological evidence to explain the defendant's propensity to lie in the guilt phase would have been innocuous, the post-conviction court found that "in combination with all the other deficiencies in this case such an error has much greater weight" and that "the absence of a psychological expert at the sentencing phase is a more obvious deficiency because a psychological expert could have helped to more fully explain the defendant's tendencies to lie and his propensity to be influenced by alcohol and/or drugs."

5. Counsel was deficient in failing to impeach the testimony of Donna Lawson, the only trial witness to place the petitioner in the victim's company at any time.

6. Counsel failed to "focus the jury's attention on several inconsistencies between the defendant's statements and the facts of the state's case." Particularly glaring was the failure to emphasize the amount of time that passed between the victim's discovery of the petitioner's act of burglary and her murder, because this factor served as the sole basis for imposing the death penalty.

7. Counsel was deficient in failing to object to improper

14

comments by the prosecution during the trial and during argument, which failures "contribute to the overall finding that the defendant did not receive the effective assistance of counsel and that this case was prejudiced by counsel's performance."[2]

## IV. Standards for Establishing and Reviewing Ineffective Assistance of Counsel.

All of the post-conviction court's bases for granting post-conviction relief were instances of ineffective assistance of counsel.

When a defendant seeks relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). There must be a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Id. at 694, 104 S. Ct. at 2068; see Best v. State, 708

---

[2]In this appeal by the state, our review is limited to the propriety of the post-conviction court's findings sustaining some of the petitioner's claims. Prior to the evidentiary hearing, the court dismissed other claims as being waived or previously determined, and after the hearing, the court denied the following ineffective assistance claims in its "Findings of Fact and Conclusions of Law": (1) choice of defense strategy; (2) failure to request adequate independent analysis of the hair samples, the fingernail scrapings, a fingerprint found on a check in the victim's pocket, bloody tire tracks at the crime scene, and the defendant's clothes; (3) failure to use a jury selection expert; (4) the lack of pretrial accessibility of counsel to the petitioner; (5) failure to file more pretrial motions; (6) failure to seek redaction of the petitioner's pretrial statements; (7) inadequate advice of counsel concerning the petitioner's right to testify at trial; (8) improper or inadequate *voir dire* of prospective jurors; (9) failure to object to improper prosecutorial commentary; (10) failure to object to improper jury instructions; (11) general inadequacy in objecting to trial court errors or evidence presented at trial; (12) failure to make an opening statement; and (13) inadequate appellate preparation and briefing. The post-conviction court also denied, after the hearing, a claim of prosecutorial misconduct that the state had failed to disclose exculpatory evidence and had "failed to reveal all promises, deals, agreements. . . made by the state with any witness or potential witness."

S.W.2d 421, 422 (Tenn. Crim. App. 1985). Should the defendant fail to establish either factor, he is not entitled to relief.

The scrutiny of counsel's performance must be "highly deferential," and the reviewing court must refrain from concluding "that a particular act or omission of counsel was unreasonable" merely because the strategy employed was unsuccessful. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "A fair assessment," the United States Supreme Court has said, entails making every effort to "eliminate the distorting effects of hindsight" and evaluating the "conduct from counsel's perspective at the time." Id., 104 S. Ct. at 2065. The court promulgated a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." Id., 104 S. Ct. at 2065. The court added:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary.
>
> In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-691, 104 S. Ct. at 2066. The court acknowledged that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions . . . ." Id. at 691, 104 S. Ct. at 2066.

With respect to the prejudice prong of ineffective assistance of counsel, a showing that "errors had some conceivable effect on the outcome of the proceeding" is insufficient. Id. at 693, 104 S. Ct. at 2067. Rather, the defendant must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. In assessing the claim of prejudice, the "court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency,

16

that the judge or jury acted according to law." Id., 104 S. Ct. at 2068. The reviewing court must consider the "totality of the evidence before the judge or jury" and should take into account the relative strength or weakness of the evidence supporting the verdict or conclusion. Id. at 695, 104 S. Ct. at 2069.

In death penalty cases, the sentencer may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964-65 (1978) (plurality opinion); see also Johnson v. Texas, 509 U.S. 350, 361, 113 S. Ct. 2658, 2666 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. See California v. Brown, 479 U.S. 538, 541, 107 S. Ct. 837, 839 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982).

There is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). In fact, in many death penalty cases, counsel has properly seen fit not to offer any evidence at the penalty phase. Melson, 772 S.W.2d at 421.

"A strategy of silence may be adopted only after a reasonable investigation for mitigation evidence or a reasonable decision that an investigation would be fruitless." Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir. 1986). Courts have held counsel's representation beneath professionally competent standards when counsel did not conduct enough investigation to formulate an "accurate life profile" of a defendant. Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir.), cert. dismissed sub nom Jackson v. Jones,---U.S.---, 116 S. Ct. 38 (1995). It is impossible that "a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." Id. (quoting Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991)).

17

The extent of investigation required depends critically upon information supplied by the defendant. Burger v. Kemp, 483 U.S. 776, 795, 107 S. Ct. 3114, 3126 (1987); see also Whitmore v. Lockhart, 8 F.3d 614, 621 (8th Cir. 1993). "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066.

The petitioner's burden of proof in all post-conviction cases filed before May 10, 1995, is by a preponderance of the evidence. Clenny v. State, 576 S.W.2d 12 (Tenn. Crim. App. 1978). A trial court's findings of fact following a post-conviction hearing have the weight of a jury verdict. Bratton v. State, 477 S.W.2d 754, 756 (Tenn. Crim. App. 1971). On appeal, those findings are conclusive unless the evidence preponderates against the judgment. Butler v. State, 789 S.W.2d 898, 900 (Tenn. 1990).

## V. Appellant's Issues.

Now, we apply the above legal principles to the issues the state has presented.

### a. Ineffective Assistance - Guilt Phase

The state asserts that the lower court erred in finding ineffective assistance of counsel through inadequate investigation and preparation at trial. Within this rubric, the state argues that the post-conviction court erroneously concluded that (1) trial counsel had failed to interview Jeff Bowen, (2) the petitioner had shown prejudice from counsel's failure to interview other customers or staff of

18

the Brainerd Beach Club, and (3) trial counsel failed to fully develop its theory of defense. The state asserts that counsel interviewed Bowen and made a tactical decision not to call him as a witness and that the record reflects no prejudice to the petitioner because of the failure to discover Jane McDonald's knowledge of the evening of February 13, 1985. The state posits that counsel effectively presented its theory by using a number of lay witnesses to establish an alibi and to attack the validity of the undercover statements by showing the petitioner's dependence on alcohol and his propensity to lie and tell grandiose tales. It argues that the petitioner's post-conviction expert, Dr. Blair, failed to establish any pathology or personality problems beyond those established by lay witnesses who testified at trial.

Although Strong assumed that Bergmann interviewed Bowen, Bergmann did not recall speaking with Bowen. Clearly, Strong did not interview Bowen, and Bowen himself did not recall either defense attorney contacting him. We find that a factual basis existed to support a conclusion that neither lawyer talked to Bowen. Regardless, the crux of the court's concern about counsel's treatment of Bowen was not so much whether they had interviewed him, but whether they had properly reacted to Bowen's description, via the composite drawing, of the man Bowen saw leaving the club with the victim. Strong, who viewed the composite drawing for the first time while testifying at the post-conviction hearing, thought the likeness resembled the petitioner, but Bowen testified that the man he saw did not resemble the February 1985 photograph of the petitioner. Bergmann admitted that, at the time of the murder, the petitioner had a full beard. Both Strong and Bergmann testified that they had not seen the drawing prior to the post-conviction hearing, but the post-conviction court found that the state had furnished both Bowen's statement and a copy of the composite drawing to counsel. Based upon the testimony it heard,[3] the court found counsel was remiss in not developing "this information [that] would have been highly beneficial to the defense

---

[3]In its oral findings of fact, the post-conviction court emphasized its reliance upon the live testimony of Bowen.

19

theory." Given the "fact" nature of the matter, this court must defer to the finding of the post-conviction court, just as we would have done had the petitioner not prevailed in the court below. In other words, the evidence does not preponderate against the court's findings.

On the issue of whether counsel was ineffective in not investigating the February 13, 1985 customers and staff of the Brainerd Beach Club, the record supports the trial court's conclusion that counsel's performance was deficient. However, the record demonstrates no prejudice to the petitioner with the exception of (1) the failure to ferret out the information of Jane McDonald that the victim came into the club with two men, neither of whom were the petitioner, and (2) the failure to obtain readily available information for use in impeaching the testimony of Donna Lawson. Each of these deficiencies in representation had prejudicial impact. Part of the defense theory was that at least two other men were interested in the victim and at least one of them may have been jealous. Donna Lawson was a key witness in that she provided the only testimony that the petitioner and the victim had conversations prior to February 13.

We agree with the trial court's finding that counsel's decision not to seek expert psychological proof to use during the guilt phase to bolster petitioner's claim that his confession was false was deficient representation under the facts of the case. The defendant's medical record reflected earlier findings of psychosis, and this fact alone warranted further investigation beyond the conference with Ken Stallings. However, we disagree that the record reflects prejudice as a result of the failure to pursue such proof.

Even though Dr. Blair testified that the petitioner's poor self-image and need for approval made him vulnerable to being manipulated into making false statements, the information would not appear to be a great revelation to a jury who had already been shown that the petitioner was capable of fantastic lies in order to

20

get attention and to enhance his stature with his audience.  Indeed, Dr. Blair acknowledged that no psychological expertise was needed in order to recognize or understand the petitioner's lying phenomenon.  Consequently, the lay proof presented on this issue in the guilt phase of the trial substantially duplicated the proffer of Dr. Blair.  Moreover, we note in passing, although it was not addressed at the post-conviction hearing, that Dr. Blair's testimony might not have been admissible at trial.  Her failure to affirm that expert testimony was needed to articulate the petitioner's lying problem supports a finding that "scientific, technical, or other specialized knowledge" would not "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" and that, accordingly, expert testimony is not required.  Tenn. R. Evid. 702.  In any event, the post-conviction court itself found that the failure to pursue expert evidence in the guilt phase was not, *ipso facto*, prejudicial.  We agree, but we disagree that it contributed anything to the finding of aggregate prejudice.

To summarize our treatment of the state's first issue, we hold that the state has failed to demonstrate that the evidence preponderates against the trial court's findings that trial counsel deficiently represented the petitioner, to the point of prejudice, in failing to use the Bowen evidence, in failing to discover the potential testimony of Jane McDonald, and in failing to impeach the testimony of Donna Lawson.  Thus, the record supports the conclusion that the petitioner received ineffective assistance of counsel during the guilt phase of his trial.

In evaluating the prejudicial impact of counsel's deficient performance, we have considered the weight of the case against the petitioner, see Strickland, 466 U.S. at 695, 104 S. Ct. at 2069, and we are aware that, usually, prosecution evidence which includes a confession of the accused amounts to a strong case. However, the confession utilized here was not of the usual variety.  It was not solemnized by a formal, official interrogation process.  There was no waiver of constitutional rights and no overt recording of the confession.  In the casual,

21

perhaps manipulative, setting in which the confession was elicited, the petitioner's mendacious propensities only sharpen the realization that this confession was vulnerable to attack. It did not pose an insurmountable barrier to finding prejudice from deficient performance of counsel, especially when the deficiency hampered the effort to impugn the confession. In this vein, evidence that would have bolstered the petitioner's claim of alibi was found by the post-conviction court to be significant to the theory of the defense. Accordingly, there was no error in ordering a new trial.

### b. Ineffective Assistance - Penalty Phase

In its next issue, the state asserts the post-conviction court erred when it found ineffective assistance of counsel during the sentencing phase of the trial. Within this rubric, the state maintains that (1) counsel reasonably relied upon the information supplied by the petitioner's one-time mental health counselor, Ken Stallings, not to present his testimony nor to seek further psychological evidence, (2) the petitioner failed to establish any prejudice in the absence of expert psychological proof, and (3) counsel was excused from developing further mitigation proof because much of its mitigation proof had been introduced during the guilt phase.

Our supreme court recently addressed the duty of counsel to investigate and present mitigating evidence in Goad v. State, 938 S.W.2d 363 (Tenn. 1996). In Goad, the court found trial counsel ineffective for failing to investigate and explore mitigating evidence relative to the Veteran Administration's evaluation of Goad and his symptoms of post-traumatic stress disorder. Id. at 372-73. In determining whether Goad was prejudiced by counsel's deficient representation, the court set forth several factors to consider:

> Where the alleged prejudice under Strickland involves counsel's failure to present mitigating evidence in the penalty phase of a capital trial, several factors are significant. First, courts have analyzed the nature and extent of the mitigating evidence that was available but not presented. Deutscher v. Whitley, 946 F.3d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992); Atkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1995). Second, courts have

22

considered whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceeding. Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990); State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). Finally, the courts have considered whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987).

Id. at 371.

"[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 544, 107 S. Ct. 837, 841 (1987).

However, attorneys representing defendants in capital cases are not obligated to parade a multitude of experts and witnesses before the jury at every sentencing hearing in order to provide effective assistance of counsel. See Harris v. State, 947 S.W.2d 156, 163 (Tenn. Crim. App. 1996) (defendant not entitled to perfect representation, only constitutionally adequate representation). Indeed, defense counsel could reasonably determine after adequate investigation and preparation that some types of traditional "mitigating" proof might be looked upon unfavorably by a jury. See Id. at 168.

This court has previously recognized that such proof may have doubtful effect in "lessening [a defendant's] culpability in the eyes of the jury." Harries v. State, 958 S.W.2d 799, 807 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. 1997); see also Rickman v. Bell, 131 F.3d 1150, 1157 (6th Cir. 1997) (finding counsel's performance deficient where he "succeeded in creating a loathsome image for Rickman -- one that would make a juror feel compelled to rid the world of him").

23

Any deficiencies of counsel in presenting mitigation proof center around the absence of (1) expert psychological proof that would have amplified the petitioner's alcohol problems and (2) lay witnesses' testimony that would have highlighted relevant background or personality information including redeeming traits and good deeds.

In this appeal, the state has failed to demonstrate that the evidence preponderates against the lower court's finding of deficient representation because expert psychological proof was not sought for the sentencing phase. The petitioner's medical history reflected a previous finding of psychosis, and Dr. Blair opined that the earlier diagnosis was likely related to the petitioner's alcohol dependency. The prior hospitalizations and diagnosis should have alerted counsel to fully explore the potential for expert assistance. Strong's single conference with Ken Stallings was not adequate investigation of the issue. Stallings' credentials as a psychologist were in doubt, he expressed antipathy toward the petitioner, and the petitioner only met with him one time. Under the circumstances of this case, where the petitioner's record reflected, accurately or not, that he had been psychotic, it was incumbent upon counsel to fully explore and develop the potential for expert evidence.

In considering the prejudicial effect of this deficiency of performance, we use the Goad analysis. In the first two factors, we look at the nature and extent of the mitigating evidence that was available and not presented and the extent to which similar mitigating evidence was nevertheless presented to the jury in either phase of the trial. See Goad, 938 S.W.2d at 371. Clearly, the extent of the petitioner's alcohol problem was presented to the jury. The nature of the problem might have been amplified by testimony such as Dr. Blair's, but she did not appreciably add to the evidence of the defendant's alcohol problem that was presented at trial. At trial, proof of the petitioner's dependence on alcohol was ample and cogent. On the other hand, the third Goad factor -- whether there was

24

such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's verdict -- weighs heavily in the petitioner's favor. See id. The proof that the petitioner killed the victim in order to avert arrest or conviction -- the solitary basis for imposing the death penalty -- was not strong.[4] As an aside, we note that Dr. Blair's proffer does not contain the sort of invidious information that has condemned proposed mitigating proof in other cases. See Grosclose v. State, 130 F.3d 1161 (6th Cir. 1997), cert. denied, ---U.S.---, 118 S. Ct. 1826 (1998); State v. Pat Bondurant, No. 01C01-9606-CC-00236, slip op. at 99-101 (Tenn. Crim. App., Nashville, Mar. 18, 1998 ), Tenn. Code Ann. § 39-13-206(a)(1) app. docketed (Tenn. 1998). We believe that the failure to seek expert psychological evidence was not prejudicial, in and of itself, on the issue of sentencing. We must, however, examine the other mitigation claim before drawing a conclusion.

Counsel failed to utilize biographical facts which would have personalized the non-testifying petitioner before the sentencer and may have revealed redeeming traits and deeds. To be sure, the petitioner's post-conviction proffer, in showing that the petitioner had been a helpful, caring father, spouse, and neighbor, duplicated proof that was introduced at trial.[5] However, the trial jury did not hear that the petitioner was credited with saving the lives of two people. Such evidence should have had some impact upon a jury that was considering a death penalty. We have considered the fact that the petitioner's decision not to testify at the sentencing hearing surprised counsel and precluded them from using some facts to which the petitioner could have testified. The petitioner's unexpected

---

[4]The post-conviction court found as ineffective assistance of counsel the failure to develop inconsistencies between the facts of the murder and the petitioner's pretrial statements. The court was especially concerned with counsel's failure to stress the lapse of time between the victim's discovery of the petitioner's involvement in burglary and the murder. The court opined that the failure to develop this line of proof prejudiced the petitioner in countering the sole aggravating circumstance in the penalty phase that he killed the victim in order to avoid detection and prosecution for the burglary. The record does not preponderate against these findings. Accordingly, these findings contribute to the cumulative ineffective assistance of counsel during the penalty phase.

[5]Some of the proffered evidence came with barbs. Debra Boggs admitted that, when the petitioner was drinking, he had threatened her life and had physically abused her.

25

refusal to testify would have hampered counsel in trying to personalize him before the jury; yet, no motion for continuance was made.  Accordingly, the post-conviction evidence showed that mitigation should have included available proof that was not otherwise imparted to the sentencer, and as we have already seen, proof of the single aggravating sentencing factor was not great.  We conclude that the failure to present biographical evidence in mitigation of the sentence was more prejudicial than the absence of expert proof.  Moreover, these combined deficiencies were prejudicial to the point of supporting the post-conviction court's findings of ineffective assistance of counsel in the sentencing phase.[6]

### c. Waiver

In the state's final issue, it argues that the issues of prosecutorial misconduct and certain trial court errors were waived when they were not objected to nor raised on direct appeal and that waiver may not be avoided through the mechanism of ineffective assistance of counsel.  Presumably, the state refers to the issues generally treated by the trial court in its findings and conclusions as follows:

> Petitioner also claims that counsel failed to object to improper comments, etc., by the prosecution and to other improper actions by the prosecution and counsel failed to file a motion for a mistrial due to improper arguments by the prosecution. . . . Counsel did not object to any of these comments. Admittedly, some of the prosecutor's comments were speculative.  Some may have even been improper.  Standing alone many of these comments may not have amounted to sufficient prejudicial error; when viewed in light of the other errors made by counsel, however, they do contribute to the overall finding that the defendant did not receive the effective assistance of counsel and that his case was prejudiced by counsel's performance.

The state relies upon State v. Overton, 874 S.W.2d 6 (Tenn. 1994), a post-conviction case, in which our supreme court reviewed claims of ineffective assistance of counsel.  In one of those claims, trial counsel had failed to object when the trial court had used inappropriate jury instructions on the issue of force in the commission of aggravated rape.  Id. at 11.  The supreme court found that the

---

[6]See n. 2, supra.

26

error "could have" been prejudicial to the petitioner and "may well have been reversible error" had it been objected to and raised on appeal. Id. Nevertheless, the supreme court held that the claim "is not a cognizable ground for relief in a post-conviction petition" because it does not implicate a constitutional issue as is necessary in a post-conviction case. Id. at 12. "Moreover," the high court said, "to allow every error committed in the trial court to be recast in a post-conviction petition as an ineffective assistance of counsel allegation would be to subvert the limited purposes of the post-conviction procedure." Id.

We decline to apply Overton to hold that the petitioner has waived the ineffective assistance of counsel claim based upon the failure to object to the alleged prosecutorial misconduct. The underlying trial court error in Overton was deemed not cognizable in a post-conviction proceeding, presumably, because it did not present a constitutional issue. See Tenn. Code Ann. § 40-30-105 (1991)(repealed 1995). However, this court has said, "Prosecutorial misconduct qualifies as a constitutional basis for relief." Coker v. State, 911 S.W.2d 357, 366 (Tenn. Crim. App. 1995). Furthermore, Overton does not account for ineffective assistance of counsel itself as a constitutional issue. See Strickland, 466 U.S. at 686, 104 S. Ct. at 2061-62. The constitutional quality of effective assistance of counsel is not always dependent upon the underlying act or omission being constitutionally flavored. For instance, the Supreme Court made it clear that, in certain circumstances, the failure to investigate a case may result in ineffective assistance of counsel, Strickland, 466 U.S. at 691, 104 S. Ct. at 2066; yet, the state and federal constitutions contain no right to investigation apart from the right-to-counsel provisions. See generally U.S. Const. Amend. V; Tenn. Const. Art. I, § 9. It may be true that, in the present case had counsel raised the misconduct issues on direct appeal, the appellate courts may have reviewed the merits of the claim even in the absence of contemporaneous objections or motions for mistrial. See, e.g., State v. Sparks, 563 S.W.2d 564, 567 (Tenn. 1978) (when prosecutor's remarks unnecessarily raised racial issues, the defense made no objection, and the

trial court should have intervened *sua sponte,* appellate court reviewed the prosecutorial misconduct issue on the merits). Nevertheless, we are reluctant to apply the Overton language to preclude review *via* waiver.

Even though the state makes no claim on the prosecutorial misconduct-ineffective assistance of counsel issue other than waiver, we feel constrained to review the issue in light of the entanglement of this issue in the post-conviction court's overall findings of ineffective assistance of counsel. The review first entails a determination of whether prosecutorial misconduct occurred. State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996), perm. app. denied (Tenn. 1997). That determination initially requires a decision about whether the challenged conduct is improper. Id. Although trial courts have discretionary authority to control the argument of counsel and counsel has wide latitude to argue the facts and reasonable inferences therefrom, "[c]losing arguments must be temperate, must be based upon evidence introduced at trial, and must be relevant to the issues at trial." Coker, 911 S.W.2d at 368. Most of the restrictions fall upon the prosecutor, who is the representative of the state and whose duty it is not only to seek convictions but also to achieve justice through proceeding fairly. Id.; Manning v. State, 195 Tenn. 94, 257 S.W.2d 6 (Tenn. 1953). The prosecutor's argument should not be calculated to inflame the jury. Coker, 911 S.W.2d at 368.

Once prosecutorial conduct is deemed improper, the appellate court's task is to determine "whether the impropriety affected the verdict." Pulliam, 950 S.W.2d at 367. Prejudice is assessed through analyzing the misconduct in light of the factors set forth in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976): (1) the misconduct viewed in context and the facts and circumstances of the case; (2) any curative measures taken by the court or the prosecutor; (3) the intent of the prosecutor; (4) the cumulative effect of the misconduct in view of the consequence of any other errors in the trial; and (5) the "relative strength or weakness of the case." Judge, 539 S.W.2d at 344.

28

If misconduct is found but no objection was made, the next layer of review in the post-conviction context is to determine whether the failure to raise or preserve the substantive issue amounts to ineffective assistance of counsel. Coker, 911 S.W.2d at 371. As we have shown above, ineffective assistance requires the presence of both the elements of deficient performance and prejudice. Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.

At the outset, we cannot review the post-conviction court's actions on these issues with the deference customary in post-conviction appeals because the lower court has not specified which of the prosecutor's actions were "speculative" or which, if any, were "improper." Moreover, the post-conviction judge did not preside over the trial, and his review of alleged misconduct was undertaken in the same way as is ours--through review of the trial transcript. Nevertheless, the lower court apparently found that some of the objectionless misconduct resulted in prejudicial ineffective assistance of counsel, and we review the cited actions in order to determine if any of them provide a basis in the record to support the lower court's general finding of ineffective assistance.

The trial court referenced various paragraphs of the amended post-conviction petition which contained allegations of such misconduct; however, among these allegations only the ones following actually specified prosecutorial actions:

1. In closing argument during the guilt phase, the prosecutor made references to:

    a. the victim's good character;

    b. the petitioner's decision not to testify;

    c. the petitioner's alleged possession of a firearm or "dope" when confronted by investigating officers after the murder;

    d. the petitioner having stolen the weapon that was used to kill the victim;

    e. the dedication of the investigating police officers as a factor

justifying a guilty verdict; and

f. the duty of the jury to convict the defendant, in keeping with the duties carried out by the police.

2. In closing argument during the penalty phase, the p r o s e c u t o r made references to:

a. the responsibility for the penalty decision rested elsewhere than with the jury;

b. the trial being necessitated by the breakdown of plea negotiations;

c. a life sentence requiring that mitigating factors outweighed aggravating factors; and

d. the jury placing weight on the good character of the victim and the grief and loss experienced by her family.

Defense counsel objected to none of these comments by the prosecutor.

Looking first to the prosecutor's guilt-phase final argument, we find that, with two exceptions, all of the cited comments were sufficiently grounded in relevance to some material issue or were within the prosecutor's prerogative of fair comment and were not improper. The exceptions are (1) the comment that the petitioner "steals his guns" and (2) the spate of comments that affirmed the merits and lifestyle of the victim. We judge the first comment, although improper, to be so banal under the first Judge factor as to be utterly lacking in impact.

The guilt-phase comments concerning the worth of the victim's life are more troublesome. See State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995) (prosecutorial commentary "regarding the personal characteristics of the victim in a murder case is generally irrelevant and designed to evoke juror sympathy"). The comments were illustrative of information the jury had received and were generally based in the evidence. Moreover, the comments praising the victim were logical responses to the petitioner's final argument which stressed the victim's

30

"darker side." There were no curative measures specifically addressed to the prosecutor's comments about the victim, but the trial court instructed the jury as to the nature of argument, the difference between argument and evidence, and that the jury must decide the case based "solely and alone upon the evidence . . . and not from any other source nor upon speculation or conjecture . . .and the law as given you by the court." The trial court instructed the jury on the burden of proof carried by the state and cautioned them to undertake their deliberations with "no sympathy and no prejudice." The prosecutor was blameworthy in that his likely intent was to portray a "good and evil" contrast between the victim and the petitioner. In light of the other errors and the relative strength or weakness of the state's case, the misconduct may have had some effect; however, upon assessment of all the factors, we fail to see that any prejudice rose to the level of denying the petitioner a fair trial. See Zirkle, 910 S.W.2d at 888.

Having reached that determination, we conclude that trial counsel deficiently represented the petitioner when they failed to object to these comments that we have deemed improper. However, because there was no substantive prejudice resulting from the prosecutor's comments, the prejudice element of ineffective assistance of counsel is not shown.

Next, we look at the comments the prosecutor made during his penalty-phase final argument. We find that, in context, none of these comments were improper.

We elaborate only on one of the issues. The prosecutor argued that the jury should not "let anybody come up here and tell you you are an executioner" and that, based upon the status of our capital crime law, "[i]f the jury unanimously determines that at least one. . . or several statutory aggravating circumstances have been proved by the State beyond a reasonable doubt, and [they] are not outweighed by any mitigating circumstances, the sentence shall be death. Take

31

nothing upon you other than that."  The petitioner claimed below that this argument violated the principles established by the Supreme Court in Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633 (1985).  In Caldwell, the prosecutor argued that the jury's decision to impose the death penalty "is not the final decision. . . .  Your job is reviewable. . . .  The decision you render is automatically reviewable by the Supreme Court."  Caldwell, 472 U.S. at 325-26, 105 S. Ct. at 2637-38. The High Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  Id. at 328-29, 105 S. Ct. at 2639.  We do not believe that Caldwell applies to the comments in the present case. Here, the prosecutor communicated to the jury that they functioned under the law of the state in discharging their prescribed duties and that a responsible decision to impose the death penalty did not cast them in the role of executioner.  These remarks do not suggest to the jury that their decision to impose the death penalty would be temporary, tentative, or conditional, depending upon the review of higher courts. See State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994). But see State v. Sparks, 563 S.W.2d 564, 568-89 (Tenn. 1978).

To summarize, we conclude that trial counsel's failure to object to the listed allegations of prosecutorial misconduct did not result in ineffective assistance of counsel which prejudiced the petitioner in either phase of his trial.

**Conclusion.**

The evidence does not preponderate against the post-conviction court's findings that prejudicial ineffective assistance of counsel occurred (1) when counsel failed to explore or utilize the information held by Jane McDonald and Jeff Bowen and (2) when they did not use readily available sources of impeachment to impeach the testimony of Donna Lawson.  Accordingly, based upon these grounds, the record supports the grant of a new trial.  Also, the evidence does not

32

preponderate against the post-conviction court's findings that prejudicial ineffective assistance of counsel occurred in the sentencing phase of the trial when counsel failed to investigate or present both expert and additional lay mitigation evidence. Thus, apart from the new trial which has now been granted, the record supports the lower court's grant of what otherwise would have been a new sentencing hearing.

The judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE


CONCUR:

_____
GARY R. WADE, PRESIDING JUDGE


_____
NORMA McGEE OGLE, JUDGE