**STATE of Tennessee, Appellee,**

v.

**Michael Lee McCORMICK, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Sept. 25, 1989.

Paul Bergmann, III, Richard K. Mabee, Rodney Strong, Chattanooga, for appellant.

Charles W. Burson, Atty. Gen., and Reporter James W. Milam, Asst. Atty. Gen., Nashville, Gary D. Gerbitz, Dist. Atty. Gen., Stanley J. Lanzo & William H. Cox, Asst. Dist. Attys. Gen., Chattanooga, for appellee.

OPINION

DROWOTA, Chief Justice.

This is a direct appeal from the first degree murder conviction and capital sentence imposed upon Michael Lee McCormick for the shooting death of Donna Jean Nichols. The sentence is based on the jury's unanimous verdict that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant. T.C.A. § 39–2–203(i)(6).

Defendant vigorously challenges the sufficiency of the proof of both his partic-ipation in the killing and the aggravating circumstance found by the jury. He also contends the introduction of incriminating statements he made to an undercover officer violates his constitutional right to counsel under the fifth and sixth amendments to the United States Constitution. In addition to other evidentiary issues, he raises two issues regarding the constitutionality of the statute under which he was sentenced. After review of the record and the law, we find no error, and affirm the conviction and the sentence.

At about 2:00 a.m. Thursday, February 14, 1985, the body of the victim was discovered in a parking area along Brainerd Road in Chattanooga. The witness, Arlinza Mobley, immediately notified the police and related that he had been gathering cardboard and boxes discarded from businesses in the area when he came upon another vehicle. He saw the taillights of the vehicle come on, and it sped away, leaving what appeared to be a pile of rags. Mr. Mobley then saw a "steaming" body lying in a pool of blood.

Two head wounds were apparent, as well as one on the hand. One spent shell casing was on the ground nearby. An autopsy later that morning showed that Jeanie Nichols had been shot at very close range, the bullet entering behind her right ear, severing the brain stem, and exiting through the left temple. Death had been almost instantaneous. No projectiles were found in the body. The victim's blood alcohol content showed she was very intoxicated.

Through information on a personal check found in the victim's pocket, police learned her identity and a description of her car. At 4:46 a.m. the car was found in an auto service parking lot that was frequently used by customers of the adjacent Beach Club, a singles' night spot. The victim's pocketbook, its contents intact, two spent projectiles and two 9 mm shell casings were recovered from the front passenger compartment. These casings and the one found at the scene were fired from the same gun, either a 9 mm or .45 calibre weapon. Faint smudges of blood stained

the covers of the front seats, and a thick film of blood covered the frame and exterior panel below the passenger door. A substance appearing to be brain tissue was visible on the carpet of the passenger side.

The victim was at home until approximately 9:30 on the night of the 13th. At 9:45 she met a man she dated frequently, and they had drinks at Merv's restaurant. When they separated at 11:30, Jeanie Nichols was driving the car later found near the Beach Club. She announced she was going to "hit" Brainerd Road, by which her companion understood she planned to visit various night spots in the area.

Over the following week police learned about, and later established at trial, a connection between Defendant McCormick and the victim. Defendant was a friend of Nichols' younger brother Hap, with whom she shared an apartment in their grandmother's home. According to Hap, he and Defendant became acquainted at Dalton Junior College, where he was enrolled as a student and Defendant worked as a media technician until 1984. The two men regularly consumed drugs together and had committed a burglary at the college and stolen electronic equipment. When the victim completed her pharmacy degree and moved to Chattanooga in 1984, she discovered these activities and McCormick's identity. She insisted that the stolen equipment be moved from the house and that her brother end his association with Defendant. Hap Nichols related all this to Defendant at the time, as McCormick later admitted, and he removed the equipment. According to family members, Jeanie was very proud of her career, had worked her way through school, and had undertaken to straighten out her brother's life.

At 9 o'clock on the morning of February 14, Defendant telephoned his ex-wife to report the Nichols' murder. He claimed that he had been dating the victim and that he had bought her a drink at 9:30 the previous night at a club called "Faces" and tried to cash a check for her. He also claimed he had been questioned by the police, although this was clearly untrue.

It was also learned that Defendant had visited at the home of a former girlfriend, near his parents' home, from 9:30 to 11:10 p.m. on February 13. He was driving his employer's red truck, and he left saying it was too early to go home. This witness reported that Defendant was intoxicated and behaved in a bizarre fashion and he spent some time removing something he had hidden under her house.

At this point McCormick was questioned by Detective Dudley of the Chattanooga Police Department. He acknowledged his acquaintance with Nichols but denied he had seen the victim since her return to Chattanooga. He said he had met a childhood friend at Bennigan's on the evening of February 13. They had a few drinks and left in separate vehicles for the Brainerd Beach Club. He had left the Beach Club at 11:00 or 11:30 p.m. and gone straight to his parent's home, where he lived. When confronted with the contradictory information police had gathered, Defendant admitted the call to his wife, but insisted he fabricated the story to engender sympathy and jealousy. He first denied involvement in the burglary to which Hap Nichols had confessed, but he said Hap's sister was present when he removed the stolen items from their home. He claimed confusion about the date of his visit to his former girlfriend, but did not deny it. He denied possessing a gun, saying he did not trust himself with one. Defendant invoked his right to counsel, and the remainder of the interview was not admitted at trial.

Defendant consented to the gathering of samples of hair, saliva, etc. and to a search of his house and vehicles. With one exception, nothing of interest was found. A hair collected from the interior of the victim's car was determined to have features similar to his, and could have come from the Defendant.

Shortly after this interview and search, Defendant left town and spent some time in Arizona. He returned, was convicted of the college burglary, and served a sentence followed by parole.

Defendant's account of his whereabouts on February 13 was confirmed in part by

the childhood friend, who had seen him at Bennigan's and later at the Beach Club. This witness left the Beach Club before 10 p.m.

It was also learned that McCormick and the victim had been seen together. An employee of the Revco Drug Store, where Jeanie Nichols worked at the time of her death, testified she and the victim had gone out together during this time. She reported three disturbing encounters she witnessed between Nichols and McCormick during the three weeks before the murder. Twice he had come to the pharmacy counter with another man and engaged the victim in conversation. On February 7 he and another man had approached her at a bar, and they had talked privately for a long time. Each of these conversations left the normally talkative and cheerful victim in a depressed mood.

Almost two years after the murder, January 21, 1987, Chattanooga Police arranged for Defendant to meet Eddie Cooper in a Georgia parole office. Cooper was an undercover officer posing as a parolee. The two moved into a motel apartment together, and over the next four weeks Cooper gained Defendant's confidence and included him in several purported transfers of stolen cars.

Early on, Defendant asked if they needed to go armed in these transactions and said he had a .45 calibre handgun. He conversed about murderers he had met in prison and professed to know about contract murder, but he made no mention of the Nichols killing. Cooper then hinted he had been offered twenty thousand dollars to perform a murder in Knoxville.

On February 9, Detective Dudley staged the arrest of a customer in a bar in the presence of Defendant and Cooper, and he spoke to Defendant. Defendant was visibly shaken. Cooper demanded to know whether Defendant was under suspicion, in light of their mutual illegal activities. Defendant explained about the burglary conviction and the murder investigation. Over the next few days Cooper pursued the subject, ostensibly concerned about their safety and Defendant's trustworthiness. When asked why anyone would kill a woman, Defendant replied, "For instance, a woman knew more about you than you wanted them to know, possibly enough that would put you in the penitentiary.... There's some things you just don't tell on yourself." He claimed he had refused one thousand dollars to kill Jeanie Nichols, but he knew the murderer. According to him the motive related to the drug inventory at her place of employment and she "was going to spill her guts." Defendant also said Nichols had been shot three times with a 9 mm or .45 calibre weapon, once in the temple, once behind the ear, and once in the hand. He stated the gun "wasn't two inches from her head." Later he said he did not know why she had been killed.

Cooper pretended to be friends with a local probation officer who had information about the murder, and on February 11, Defendant insisted that Cooper confirm that the murder weapon was a .45. He said, "I think I know where one is [but] it wouldn't be that one. I can guarantee that."

On February 16, Cooper exchanged a large sum of money with another man in Defendant's presence, admittedly a ruse to suggest that he had engaged another accomplice for the Knoxville "contract."

On February 17, 1987, the Defendant unexpectedly began to confess to Nichols' murder. Cooper managed to record the conversation, which was played for the jury along with several previous conversations. Defendant said that he had killed Nichols but not for $1,000.00. Supposedly, she was "holding out" some drugs. He claimed that he had killed her "over some money" and said he had been paid $3,500.00 but did not name who had paid him. He and Nichols had met at the Beach Club and left together. He had then killed her, dumped her body in Eastgate, parked her car at an automatic transmission business near the Beach Club, and driven away in his van. In one cryptic remark, he implied that the time of the murder was 10:37 p.m. He also said he had taken the gun apart and thrown the pieces into four or five different rivers.

The Defendant's parents testified that Defendant, who was an adopted child, had a serious drinking problem and had been living with them at the time of the murder. They testified that he had come home that evening between 11:00 and 11:30 p.m. Shortly thereafter he went out again for a few minutes but did not take a vehicle. He returned around 12:10 a.m. and remained with his mother in the living room from 1:00 to 2:00 a.m., and he retired at 3:00 a.m.

At the sentencing phase the State presented no further proof. In mitigation, Defendant's father described his son's serious drinking problem, which had begun at age 14 or 15. It became worse, and was complicated by marijuana use, after his discharge from the Air Force in 1974. He had twice entered treatment programs, but in 1984 when he returned home after his divorce, the drinking had become constant. Defendant's alcoholism was corroborated by the trial testimony of various acquaintances. In addition, counsel argued Defendant had no significant criminal history. T.C.A. 39–2–203(j)(1), (8).

Defendant argues that his confession was a lie told to gain Cooper's trust and an opportunity to earn large amounts of money from Cooper's criminal activities. There is no doubt in this record that Defendant was prone to brag about imagined exploits, especially when he was drinking, or that his numerous statements are inconsistent with each other and in some ways with the physical evidence. But several accurate details were not released to the media, particularly the number of shell casings found, the precise location of the wounds, the calibre of the weapon, and the check found on the victim which she had attempted to cash earlier in the evening. In addition, one of the motives Defendant claimed, to prevent disclosure of the burglary, was thoroughly corroborated by independent evidence. McCormick knew through Hap Nichols that the victim had discovered the stolen items and learned of his involvement. He also stated that she was present when he removed the items from her home.

■ The credibility of witnesses and of admissions made by an accused are matters for the jury to determine. A guilty verdict resolves all conflicts in favor of the state's theory, and on appeal a reviewing court may consider only whether the record can rationally support the verdict reached by the jury. We note here the jury was made fully aware of the tactics used by officer Cooper and of Defendant's alcohol problem and his penchant for lying and bragging. The confession made on February 17, as well as other statements, were tape recorded and played for the jury. We further observe that none of Defendant's other boastful lies incriminated him in a particular crime. These internal contradictions do not alone raise in our minds a reasonable doubt of the truth of the final confession.

■ The record does present proof from which a jury could rationally conclude that Defendant, was guilty of first degree murder and that his purpose was to prevent the victim from disclosing evidence that would result in his lawful prosecution for burglary.

■ Defendant frankly urges this Court to extend the holding of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1964) and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), to create a right to the assistance of counsel in what he terms "quasi-custodial" communications with officers of the state. He argues that his invocation of his right to counsel in the February 22, 1985, interrogation remained in force and should preclude further police-initiated questioning under any circumstances. It is well settled that the right to counsel in aid of a person's fifth amendment privilege not to incriminate himself arises only during custodial interrogation because of the peculiar hazards there presented. *See Minnesota v. Murphy*, 465 U.S. 420, 429–32, 104 S.Ct. 1136, 1143–44, 79 L.Ed.2d 409 (1984); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *State v. Underwood*, 669 S.W.2d 700, 703–04 (Tenn.Cr.App.1984). We find no authority for the position that surreptitious contact between police and a suspect not in custody entails any of the

risks presented by custodial questioning, and we are not persuaded that it does. Plainly, Defendant was free to come and go at will during his association with Officer Cooper. He was not in custody and was not entitled to *Miranda* warnings or the assistance of counsel when he had not been charged and was not in custody. *See State v. Mosher,* 755 S.W.2d 464 (Tenn.Cr. App.1988).

In a similar vein, Defendant urges an extension of the sixth amendment guarantee of counsel that arises when an accused is formally charged with a crime. He would have us include within the formal adversarial context the point at which a suspect becomes the focus of an investigation. Again it is settled that this guarantee is "applicable only when the government's role shifts from investigation to accusation." *Moran v. Burbine,* 475 U.S. 412, 430, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). Surreptitious gathering of an accused's communications has been held to circumvent the Sixth Amendment right to counsel, but only after that right has been triggered by formal accusation. *See Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *State v. Berry,* 592 S.W.2d 553 (Tenn.1980).

 Defendant argues that photographs of the victim and testimony that he possessed a weapon several weeks before the crime should have been excluded because the prejudicial effect outweighed the probative value of the evidence. We disagree. The photographs are not gruesome, and although it was not disputed, they depict the number and location of the wounds, as precisely described by Defendant to Cooper. Testimony from Defendant's ex-wife that in January 1985 he told her he had a gun was probative on a disputed issue, in light of his contrary claims to Detective Dudley. The trial court sustained an objection to the less relevant, more prejudicial circumstances surrounding the January episode.

 Defendant makes two arguments that his sentence is unconstitutional. The assertion that capital punishment is inherently violative of the eighth amendment has been considered and rejected by the Court many times. *See, e.g., State v. Dicks,* 615 S.W.2d 126 (Tenn.1981). The argument that the aggravating circumstance provided in T.C.A. § 39–2–203(i)(6) is unconstitutionally vague appears to be novel. Subsection (i)(6) states as one basis for imposing a capital sentence, "The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." It is insisted that this section is intended to apply only to the victims of a crime or first-hand witnesses, or to arrests or prosecutions that are underway, as evidenced by the prior cases utilizing this circumstance. We see no reason to limit the plain language of the statute in this manner. The statute is sufficiently clear by its terms to put a person of ordinary intelligence on notice of that homicide which is punishable by death. *See Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *State v. Thomas,* 635 S.W.2d 114 (Tenn.1982). It is also sufficiently definite to guide the jury's discretion and to inform them what must be found in order to impose the death sentence. *See Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

 We are charged by law to determine whether the sentence was imposed in any arbitrary fashion; whether the evidence supports the aggravating circumstance found by the jury and whether it is outweighed by any mitigating circumstance; and whether it is disproportionate to penalties imposed in similar cases. T.C.A. § 39–2–205(c)(1)–(4). The record suggests no arbitrary basis for the jury verdict. The single aggravating circumstance found is supported by evidence, as explained in the discussion of the evidence. In our judgment, the proof offered in mitigation does not show such mental impairment or inconsistent social history that it calls for leniency in this case. With respect to cases involving similar factors, we note that even extreme and debilitating alcoholism has been held not to mitigate

against the death penalty, where an especially heinous murder was committed during a larceny. *State v. Barnes*, 703 S.W.2d 611 (Tenn.1985). Other decisions affirm the sentence where only one aggravating factor is found. *E.g., State v. Matson*, 666 S.W.2d 41 (Tenn.1984) (felony murder); *State v. Caldwell*, 671 S.W.2d 459 (Tenn. 1984) (prior violent felony); *State v. Austin*, 618 S.W.2d 738 (1981) (murder for remuneration). Murder of a witness who was not an immediate victim was an aggravating circumstance in *State v. Melson*, 638 S.W.2d 342 (Tenn.1982), and *State v. Teague*, 680 S.W.2d 785 (Tenn.1984). Although the combination of factors in this case is not duplicated elsewhere, other cases do not demonstrate that the sentence imposed here is disproportionate. *See State v. Barber*, 753 S.W.2d 659 (Tenn.1988).

The sentence of death shall be carried out as provided by law on the 6th day of December, 1989, unless otherwise ordered by this Court or by other proper authority.

FONES, COOPER, HARBISON and O'BRIEN, JJ., concur.