IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 27, 2004 Session

## STATE OF TENNESSEE v. MICHAEL LEE McCORMICK

**Direct Appeal from the Criminal Court for Hamilton County
No. 167205     Douglas A. Meyer, Judge**

---

**No. E2003-02689-CCA-R9-DD - Filed November 15, 2004**

---

The Defendant, Michael Lee McCormick, was convicted in 1987 of the first degree murder of Donna Jean Nichols. The Defendant was sentenced to death for the murder. The Defendant's conviction and sentence were affirmed on direct appeal. See State v. McCormick, 778 S.W.2d 48 (Tenn. 1989). Subsequently, the Defendant filed for post-conviction relief on the grounds of ineffective assistance of counsel and a new trial was awarded. See Michael Lee McCormick v. State, No. 03C01-9802-CR-00052, 1999 WL 394935 (Tenn. Crim. App., Knoxville, June 17, 1999). In conjunction with the new trial, defense counsel filed a motion to suppress statements the Defendant made to police officers prior to his 1987 arrest. The trial court granted the Defendant's motion. The State now appeals by permission. See Tenn. R. App. P. 9. We affirm in part and reverse in part.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court
Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Mike Richardson and Mary Ann Green, Chattanooga, Tennessee, for the appellant, Michael Lee McCormick.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Joseph F. Whalen, Associate Solicitor General; Bill Cox, District Attorney General; and J. Michael Taylor, District Attorney General Pro-Tem, for the appellee, State of Tennessee.

**OPINION**

A brief review of the facts adduced at the Defendant's first trial will be helpful. See generally State v. McCormick, 778 S.W.2d 48 (Tenn. 1989). During the early morning hours of February 14, 1985, Donna Jean Nichols' body was found in a parking area along Brainerd Road in Chattanooga. The victim had been shot in the head at close range. In a back pocket of the victim's

jeans, police found a blank signed check made out for $20. The ensuing police investigation revealed no witnesses to the crime.

The Defendant was a friend of the victim's younger brother Hap. The Defendant and Hap had committed a burglary at Dalton College in Georgia and stolen electronic equipment. Some of this equipment was stored at the apartment that the victim shared with Hap. When the victim learned about the burglary, she insisted that the stolen goods be removed and that her brother end his relationship with the Defendant. Hap told the Defendant about the victim's concerns.

Detective Charles Dudley of the Chattanooga Police Department became the lead investigator on the case; it was the first homicide case in which he served as lead detective. Through his investigation, he discovered that the Defendant had told his ex-wife that he had seen the victim on the night she was murdered. Accordingly, Det. Dudley decided to talk with the Defendant. In reviewing arrest reports on the morning of February 22, 1985, Det. Dudley discovered that the Defendant had been arrested for DUI. Because the Defendant was already in custody, Det. Dudley requested that the Defendant be brought to his office for an interview.

Det. Dudley obtained a waiver of rights from the Defendant and the Defendant agreed to talk with the detective about the murder investigation. This conversation was tape-recorded and admitted into evidence at the suppression hearing. The Defendant told Det. Dudley that he had known the victim for three to four years. They had met at Dalton Junior College in Georgia where the victim was a student and the Defendant was a media technician. The victim's brother Hap worked with the Defendant as a student aide.

The Defendant told the detective that he had not seen the victim since she had returned to Chattanooga. He said that on the night she was murdered, he went to Bennigan's restaurant on Brainerd Road at about 6:00 or 6:30 p.m. He happened upon a friend there, and they went to Brainerd Beach Club. The Defendant danced with a couple of women and then went home at about 11:00 or 11:30 p.m. The Defendant was living with his parents at the time.

The Defendant stated that he had spoken to his ex-wife on the morning of either the 14th or 15th of February and told her that he had dated the victim once or twice and was very upset at her death. He told his ex-wife that he had seen the victim on the night of her death, had bought her drinks, and was going to cash a check for her. The Defendant told Det. Dudley that he told this "fabricat[ion]" to his ex-wife in an attempt to gain her sympathy because she was complaining to him about being late on his child support. He told the detective that he had not seen the victim on the night of her death, nor had he spoken to her, nor had he ever dated her. He said that he had never been in her car. The Defendant stated that he first learned about the victim's death over the radio.

As the interrogation progressed, the Defendant repeatedly asserted that he had nothing to do with the victim's death. Eventually, the following exchange between the Defendant and Det. Dudley occurred:

-2-

Det. Dudley: All right. In the very beginning, I told you there were some tests that we could take. There's a series of tests here, which would consist of some personal tests which would require a hair from you, a blood sample from you, which you have the right to refuse.

Defendant: I'm willing to do it.

Det. Dudley: If you're willing to do this and sign a form, we'll have the test. We also have the polygraph operator here. Now, a polygraph cannot be used for you or against you. It gives us basically an idea. Would you be willing to submit to a polygraph examination?

Defendant: Yes, sir.

Det. Dudley: And you wouldn't have any qualms about it?

Defendant: No, sir.

Det. Dudley: The thing that I'm curious about, Mike, and like I say, this is my job. It's hard for us to sit down and talk to a total stranger that we don't know and that doesn't know us, you know. Over a period of time you can develop a little bit of trust. But, see, we deal in facts, and our main concern in this job is to separate fact from fantasy. And, you know, just from everything that you've told me and incidents that have been related to me, it's very hard for me to sit down and realize. I have got a person that can tell me the type of clothing that you were wearing that night. Now, what I would like to do -- you live with your parents, right?

Defendant: Yes, sir.

Det. Dudley: Do you pay any kind of rent there or anything?

Defendant: I did pay when I had it.

Det. Dudley: So you just try to help them out as best you can?

Defendant: Yeah.

Det. Dudley: I would like to get in touch with your parents and get that clothing that you were wearing that night for examination. I would also like to examine both

-3-

vehicles that you were operating. Would you be willing to cooperate that far?

Defendant: Sure.

Det. Dudley: And you feel that no way, shape, form or fashion that you can be connected into this?

Defendant: I didn't have anything to do with it, no, sir. I've done a lot of weird things, but I didn't have anything to do with that.

Det. Dudley: What do you mean by "weird things"?

Defendant: Well, the incidents fabricating stories and, that we discussed, you know. I've had my problems, but I --

Det. Dudley: Have you ever sought any help, I mean serious help?

Defendant: At one time I was going to AA meetings. It didn't last too long. I'm definitely an alcoholic.

. . .

Det. Dudley: I notice several scratches here on your arm. I'm going to ask you, if you would, to stand up and remove your shirt for me and let me just take a look.

Defendant: All right.

Det. Dudley: Could you tell me how you got these scratches on your arm?

Defendant: Just working, I guess. I've got a dog.

Det. Dudley: Would you slide that shirt off? What kind of dog you got?

Defendant: It's an Australian shepherd with a pug face. (Inaudible). I think these right here are the handcuffs.

Det. Dudley: That right there, that's what I'm talking about. There's right here looks like scratch marks on that.

Defendant: Yeah, just working, I guess, maybe, and I deal with a lot of equipment, you know, and sticking my arms and stuff with it.

-4-

Det. Dudley:   What kind of equipment?  Computer (inaudible)?

Defendant:    And photocopiers.

Det. Dudley:   Turn around here just a little bit.  Yeah, here's a scratch mark here behind your ear.  Do you recall how that happened?

Defendant:    Not offhand, no, sir.

Det. Dudley:   Do you have any scratches or any scratch marks on your legs or anywhere?

Defendant:    Not to my knowledge.

Det. Dudley:   Have you got on underwear?

Defendant:    No, sir, I don't.

Det. Dudley:   Well, I hate to tell you to do this, but I need to look.

Defendant:    Okay.

Det. Dudley:   You don't have to allow me to do this.

Defendant:    I'm willing to do anything I can to prove my innocence.  I don't recall any there.

Det. Dudley:   Turn around.  Would you have any objection if I got our I.D. man up here to take photographs of you -- go ahead and pull your pants up -- photograph you with your shirt on and also take a photograph of those scratches on your arms?

Defendant:    I wouldn't have any qualms at all.

Det. Dudley:   Okay.  As of now, I'm going to go ahead and terminate the interview and explain to you some things and we will turn the tape back on.  I want to show you a form that we have to collect evidence.  And, in fact, before I do cut the tape off, it looks like we do have a few seconds of tape left to get this.  Let me read this to you.  If you would, just read along right here with me.  If you'll notice, it's authorized consent to collect physical evidence.  "I," your name would go right here, "have been informed of my right not to submit to the procedures" -- excuse me -- "as prescribed below for the purpose of

collecting physical evidence. These procedures consist of the collection of blood specimen by a licensed medical technician." That means you'll go to a hospital, we won't even attempt to draw it here. "The collection of a head and pubic hair samples and a collection of a saliva sample. I authorize," that would be me, "of the Chattanooga Police Department, to arrange for the collection of these items and further agree that they may be used as material evidence in their investigation. This permission is given" to me, given to me, "to the officers named voluntarily, and no threats and promises have been made against me." You do understand that you're not required to sign this form?

Defendant: Yes, sir.

Det. Dudley: And that you do this on your own free will?

Defendant: Yes, sir.

Det. Dudley: And you are willing to submit to this?

Defendant: I'd be willing to do it. I'd like to have a lawyer --

Det. Dudley: You would like to have --

Defendant: -- at this point.

Det. Dudley: -- an attorney?

Defendant: But I'm willing to do anything.

Det. Dudley: Well, see, we've got to know. Do you want to consult with an attorney or do you want to go ahead and work with us? It's your choice now.

Defendant: Like I say, I'll do anything, but I still think I, you know, like to have a lawyer with me, and I'll be glad to do that.

Det. Dudley: Okay. Now back to the polygraph examination. Are you willing to submit to a polygraph?

Defendant: Sure.

Det. Dudley: Do you want a lawyer present at the polygraph?

Defendant: Yes, sir, I'd like to, you know. I think it's my best interest. I'm willing to do anything that will help you in this case, but I --

Det. Dudley: As I told you in the very beginning, if you were innocent, you had no qualms.

Defendant: I'm --

Det. Dudley: No worries.

Defendant: -- completely innocent of this murder.

Det. Dudley: And I can tell you, if you do want an attorney present, he would probably advise you against taking these tests if he feels any inclination at all that you're guilty.

Defendant: Okay. See I'm, I'm in over my head. I don't know -- I'm willing to do anything to prove my innocence because I know I'm innocent of this murder.

Det. Dudley: What I'd like to do then, if you are innocent of this murder, is get these samples today and just get you on out of the picture. I've got to eliminate people.

Defendant: That's fine. Sure. But <u>can we still go ahead get me set up? I can't afford a lawyer</u>. I don't, see, I don't know what to do.

Det. Dudley: Okay.

Defendant: You understand what I'm saying?

Det. Dudley: An attorney, as far as us appointing you an attorney, if you're in custody and unable to make bond, they will appoint you an attorney. If you wish to have an attorney present, you are making bond on this DUI charge, then the Court will probably require you to retain your own.

(Sound of tape cutting off)

(Emphases added.) Det. Dudley admitted at the suppression hearing that he continued his conversation with the Defendant while there was no tape in the recorder. When the recording resumes, Det. Dudley is reviewing with the Defendant the relevant forms for the taking of physical evidence. Following this, Det. Dudley returned to the topic of the Defendant's conversation with

his ex-wife about the victim's murder. Det. Dudley told the Defendant that this conversation was "very important" and requested the Defendant to recall it "word for word, exactly what you told her." The Defendant replied,

> Something to the effect that I met Jeannie [the victim] there to cash a check. I don't remember the amount. Twenty dollars stands out in my mind, but I don't, you know, I can't be positive of that. You know, how sad I was, you know, couldn't believe it. You know, I made it really sound like I was, was involved with the girl, trying to make my ex-wife feel sorry for me and this sort of thing.

Following this interrogation, Det. Dudley obtained physical evidence from the Defendant's person and also searched the Defendant's home and vehicles. The police did not arrest the Defendant, however. The Defendant left town for a period of time and then returned. He was subsequently convicted of the burglary of Dalton College and served some time in a Georgia prison. He was later released on parole.

The Defendant remained the key suspect in the victim's murder. Accordingly, the police decided to conduct an undercover operation in an attempt to elicit incriminating information about the murder from the Defendant. To this end, with the cooperation of the Defendant's Georgia parole officer, Chattanooga Police Department undercover officer Eddie Cooper posed as a fellow parolee and met the Defendant at the Defendant's Georgia parole office on January 21, 1987. According to his testimony at the suppression hearing, Detective Cooper's goal was to "forge a friendship" with the Defendant and gain his trust and confidence. To that end, Det. Cooper struck up a conversation with the Defendant and the Defendant suggested they meet for a beer at a local bar. The two men met there, where the Defendant drank some beer, and they met there again the next day, with the Defendant again drinking beer. The men discussed why they had been incarcerated with Det. Cooper telling the Defendant that he had been convicted of car theft. The men also discussed the parole officer's suggestion that they go to work at a local carpet mill. The Defendant was not enthusiastic about this prospect. Det. Cooper told the Defendant that he could arrange to have someone "cover" and report falsely that the Defendant was working at the mill. Meanwhile, Det. Cooper could involve the Defendant in several transactions purporting to involve stolen cars. For his participation in these "crimes," the Defendant would be paid $100 per transaction. Det. Cooper arranged the first of these transactions on January 24 and paid the Defendant $100 as agreed.

At some point during their early discussions, Det. Cooper asked the Defendant if he might be interested in a contract murder involving a lot of money. The Defendant indicated that he was interested. Det. Cooper later told the Defendant that he was working on a contract to kill someone in Knoxville for $20,000, and offered to split the proceeds with the Defendant if the Defendant would participate in the killing. According to Det. Cooper, the Defendant was enthusiastic about this prospect.

When Det. Cooper first met the Defendant, the Defendant was living with his parents and working for a computer company. The Defendant told Det. Cooper that he was having problems

staying with his parents. Det. Cooper confirmed this report with the Defendant's parole officer who told Det. Cooper that the Defendant's problems with his parents stemmed from his drinking. As part of her cooperation with the undercover operation, the Defendant's parole officer told the Defendant's mother that, in order for the Defendant to address his drinking problem, she should kick the Defendant out of her house. The Defendant's mother took this advice and told the Defendant he would have to leave her residence. Meanwhile, Det. Cooper suggested to the Defendant that they share an apartment, to which the Defendant agreed. The Defendant then left town for several days. When he returned, the two men engaged in their second "stolen" vehicle transaction, with Det. Cooper again paying the Defendant $100. Det. Cooper testified that they eventually conducted five or six of these "crimes."

On February 2, Det. Cooper rented a motel suite in Chattanooga for the two men to share as an apartment. Det. Cooper paid all of the rent charged for this lodging. Det. Cooper stated that he and the Defendant both stayed there "some" nights, with the Defendant sometimes spending the night elsewhere with a girlfriend. The Defendant did move his possessions into the suite. The Defendant also brought liquor into the residence; Det. Cooper stated that he never brought any in.

On February 9, the two men participated in another "stolen" car deal and then went to a bar. Det. Cooper had arranged for Det. Dudley to arrive at the bar while they were there and pretend to arrest someone. Det. Cooper was hoping this event would trigger some conversation between he and the Defendant about the Nichols murder: an event the two men had not yet discussed. Det. Cooper testified that, after Dudley "arrested" their accomplice, Dudley walked over to the Defendant and told him, "I haven't forgotten you." The Defendant became concerned about this, fearing that he would be found in violation of his parole.[1]

At this point, Det. Cooper turned on the tape recorder he was secretly wearing and recorded the conversation he had with the Defendant after they left the bar, a transcript of which was admitted at the suppression hearing. During that conversation, Cooper asked the Defendant, "[w]hat in the hell's going on?" The Defendant replied that he knew Dudley because Dudley had questioned him about the victim's murder. Cooper asked, "[w]ho killed the damn woman?" and the Defendant told him that the murder was "unsolved." Cooper expressed concern that Dudley had now seen them together, stating, "Son, this's got me nervous." Cooper again asked who murdered the victim, and the Defendant again told Cooper that it was unsolved. The Defendant explained that he had been questioned because he had gotten some of the property that the victim's brother had stolen from the college.

Referring to the planned "hit" in Knoxville, Cooper again told the Defendant, "I've got to know what in the hell's going on." The Defendant repeatedly denied any involvement in the murder. Nevertheless, Cooper stated, "Well, you know, hell, here we are talking about wasting that son-a-bitch in Knoxville and then here you come up involved in a damn murder." Cooper continued: "If

---

[1]Apparently, the Defendant's presence in a bar in Chattanooga in the presence of a known "felon" would have been grounds for a parole violation.

you're involved in something like that, gosh damnit, be straight up and tell me so, so we can do something about it." The Defendant repeatedly denied any involvement, even after Cooper said, "If you killed the heifer, fine and dandy."

Changing tactics, Cooper asked the Defendant, "What if [Dudley] tags us and goes to Knoxville with us? What do we do then? We take that son-of-bitch out, kill his ass. What do we do then?" The Defendant then told Cooper that the best thing for Cooper to do would be to complete the Knoxville job by himself, or with someone else, because he (the Defendant) did not want to "cause no shit." The Defendant told Cooper that the only real trouble they faced was his being arrested for violating his parole and being placed back in jail. He told Cooper he would spend the next few nights with his girlfriend so as to avoid Cooper's being tied up with him. Later in the conversation the Defendant said, "You know, if it takes it, hell, I'll, you know, find another place for a couple of weeks, you know."

Cooper testified that, after he had turned the recorder off, he had further discussions with the Defendant about the Nichols murder. Cooper stated that during this later, unrecorded conversation, the Defendant told him he had been approached about committing it, had declined the offer, but knew who did it. Cooper testified the Defendant stated that he told whoever approached him that "he wouldn't do it but he would tell them how to do it." The Defendant told Cooper that the victim's death had something to do with drugs. The Defendant also told Cooper that the victim had been shot three times.

Det. Cooper secretly recorded another conversation he had with the Defendant on February 11, a transcript of which was admitted at the suppression hearing. During this discussion, the Defendant again brought up the possibility of his leaving town. Det. Cooper replied, "It's kinda hard to, ah, break a partnership up, you know, that's working, you know what I mean?" The Defendant responded, "But what I'm saying is once I, you know, I get reestablished [in Georgia], we can continue to make money, and continue to stay in contact, or we can hit the road, jack, either way we want to do it. I mean, it's entirely up to you." Shortly thereafter, the following discussion occurred in reference to the proposed Knoxville "hit":

Det. Cooper:   I - I'm 'onna be, I'm 'onna be honest with you. All that damn mess about that f_ _ king girl, I could give a shit less about that heifer. You know what I mean?

Defendant:   Yeah, I know what you mean.

Det. Cooper:   But, what I've said, and I, and, honestly, I think you're bullshitting me about it, Mike.

Defendant:   They ain't no bullshit. They ain't a bit of a f_ _king bullshit. I don't know no more who done it than anybody did.

Det. Cooper: Well, see, huh, there again, you go from one thing to another. You te--, you said one thing and then now you say another.

Defendant: Well, I know that

Det. Cooper: But I don't know what

Defendant: there was some money offered on it, and, that's about all

Det. Cooper: And I,

Defendant: I know.

Det. Cooper: and I don't know what to think, bud. And what I'm saying is, what we're fixing to bite off is big business. And when it all comes down to the nut cutting, me and you gonna have to be standing there together, by ourself, no matter what comes up. Are you ready for that?

Defendant: I'm ready for that part. The only part I see with the problem is, is you convincing yourself. If you, like I told you, I told you when we was riding back in the truck the other night, I said look, you do what you feel's right, I said, there ain't gonna be no hair off my ass if you want, cut me out of this or whatever, it don't matter to me, one way or the other. I can take it one way, or I can take it the other. I'm ready for my part of it.

Det. Cooper: Well, that's, that's just what I've been trying to say. We've got, you know, hey, I, ah huh, all that mess, I wish you had. That'd make me feel a hell lot better about it. You know. But,

Defendant: Well, even if I had, I wouldn't set and admit it to anybody.


Later, the Defendant said, "[M]e and you both are survivors. We're gonna make it one way or another. You know. If we have to do it together, that's great. That's the way I'd like it. If we have to do it apart, hell, that ain't no hair off my ass."

Det. Cooper did not see the Defendant again until several days later, on February 16. On that day, the Defendant and Det. Cooper were in the motel room with another man named Jay Lewis. Mr. Lewis was in fact a confidential informant working for Det. Cooper. While the three men were together, Cooper paid $2,000 in cash to Mr. Lewis in the Defendant's presence. Det. Cooper testified that he did this in order to "leave an impression [t]hat maybe Lewis had done something for [him] and, and [he] was paying him." Cooper did not tape record this transaction.

The Defendant and Det. Cooper were again in the motel room together on the night of February 17. Although Det. Cooper was "wired," he had not turned the recorder on. Det. Cooper testified that, during his "general" conversation with the Defendant, "[h]e just out of the blue, he turns around to me and said, 'I killed the goddamn bitch.'" At this point, Det. Cooper turned on the recorder.

The Defendant is then recorded stating, "I wasted that goddamn bitch. And it wadn't for no f_ _king thousand." The Defendant told Det. Cooper that he hadn't admitted the killing before because he had been scared and told Cooper that he was the only person he had admitted it to. The Defendant said, "It's been in the back of my mind since the night it happened. Ten thirty seven." The Defendant said that he'd been at the club with the victim that night, "and she decided she wanted to leave and I left with her, met her out in the parking lot, and wasted her ass and dumped her out in Eastgate. Parked her car back here at the Beach Club, got in my damn van and drove off." The Defendant claimed to have been paid $3,500 to commit the killing. The Defendant also stated that he took the murder weapon apart and threw the pieces in "four or five different rivers." The Defendant was arrested for the victim's murder the next day.

Dr. Murray Wilton Smith testified on behalf of the Defendant as a physician specializing in the practice of addiction medicine. Dr. Smith reviewed numerous medical and other records of the Defendant's history and conducted a clinical interview with the Defendant. Dr. Smith also reviewed the taped conversations between the Defendant and Det. Cooper. As a result of this investigation, Dr. Smith opined that the Defendant "meets all the criteria for chronic alcoholism." Dr. Smith testified that his review indicated that the Defendant "was a daily heavy drinker." As an alcoholic, Dr. Smith stated that the Defendant "would say anything, do anything, whatever it takes to obtain his alcohol is what he would do, because it's the most important thing in his life."

Dr. Smith was of the opinion that Det. Cooper "clearly coerced" the Defendant's incriminating statements. Dr. Smith explained:

[Det. Cooper] threatened to remove the most important thing that [the Defendant] had in his life: an easy supply of liquor, a place to live where he didn't have anybody looking over his shoulder and saying no, I don't want you doing that, and a free place to live. That, that's a pretty big threat. For an alcoholic, it's a big threat.

Dr. Smith stated that, "for the alcoholic . . . the threat of losing the alcohol to them is like a threat of death."

Dr. Keith Allen Caruso also testified on behalf of the Defendant as an expert in forensic psychiatry. Dr. Caruso interviewed the Defendant on four occasions for a total of about nine and one-half hours. Dr. Caruso also listened to the taped conversations between the Defendant and Det. Cooper. Dr. Caruso additionally reviewed numerous other records and reports. Dr. Caruso concluded that, in his medical opinion, the Defendant suffered from "alcohol dependence, polysubstance abuse, [and] narcissistic personality disorder with antisocial features." As a result of these conditions, the Defendant is, according to Dr. Caruso, "predisposed to make false statements, but also predisposed to make an involuntary statement." Dr. Caruso stated further that "there was a degree of, of coercion or inducement in that [the Defendant] felt that this lifestyle [being provided by Det. Cooper] was going to be cut off, that he was going to be replaced by Jay Lewis," and that, were he to confess to murdering the victim, "there seemed to be inducements of future bounty and being able to continue this lifestyle or even improve upon this lifestyle."

On cross-examination, Dr. Caruso acknowledged that the Defendant's I.Q. was "better than average" and that he was, at least in part, using Det. Cooper as a "piggy-bank" and could have been lying to the undercover officer. He also acknowledged that the Defendant could have been telling the truth to Det. Cooper because the Defendant trusted him and viewed the relationship as a partnership.

Bertha McCormick, the Defendant's mother, testified that, after he was released from the Georgia prison on parole, the Defendant came to live with her and her husband. She stated that the Defendant had had an alcohol problem since age fourteen and that, while he was living with them while on parole, he drank "all the time." Ms. McCormick explained that she developed a friendship with the Defendant's parole officer, Debbie Simpson. She thought that Ms. Simpson wanted to help the Defendant overcome his drinking problem. Ms. McCormick testified that Ms. Simpson told her that "the only way he'd ever get help was that [she] would put him out on his own, that there was -- he'd never be any better if [she] didn't put him out on his own." Ms. McCormick followed this advice and told the Defendant that he would have to move out. As far as she knew, the Defendant left her house and moved in with Det. Cooper (whom she knew only as Eddie Cooper).

Ms. McCormick did not know how much money the Defendant was making at the time, but he did not pay her any rent and she paid for his food while he was living with her. She acknowledged that the Defendant had been employed while on parole.

Prior to trial, the Defendant moved to suppress the statements he made to Det. Dudley after stating that he wanted a lawyer. He also moved to suppress the statements he made to Det. Cooper. After an evidentiary hearing, the trial court granted both of the Defendant's motions. The State now appeals.

## STANDARD OF REVIEW

Our supreme court has set forth our standard of review for motions to suppress as follows:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's application of law to the facts is a question of law which this Court reviews de novo. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

## ANALYSIS
### I. Statements to Detective Dudley

The Defendant moved to suppress all of the statements he made to Det. Dudley subsequent to his request for a lawyer. The trial court sustained the Defendant's motion, finding as follows:

> . . . when Detective Dudley started talking with the [D]efendant about a polygraph examination and taking various samples of items from the [D]efendant, the [D]efendant clearly indicated several times that he felt this was a little outside his area of knowledge and that he wanted a lawyer. The [D]efendant continued to state that he wanted a lawyer until the tape ended. When the tape restarted, the [D]efendant was consenting to various things without any further mention or explanation of why a lawyer would not be needed.
> . . .
> After carefully reviewing the evidence, this court holds that the [D]efendant's requests for an attorney were unambiguous and that questioning should have ceased. Therefore, the [D]efendant's motion is GRANTED in that all statements made to Detective Dudley on 2/22/85 after the first request for an attorney are suppressed.

In a footnote, the court added:

> Even if this court had found that the [D]efendant's initial request was ambiguous, the remaining portion of the interview establishes that the [D]efendant continued to request an attorney. The officer stated that he felt the initial request was ambiguous and that is why he followed up with further questions about the request.

> The [D]efendant, however, continued to state that he wanted a lawyer. It was only after the tape went off and came back on that a lawyer was no longer mentioned. This court finds this to be highly suspect and finds the officer's testimony on this matter insufficient.

(emphasis added).

The State now argues on appeal that the trial court erred in suppressing any portion of the Defendant's statements to Det. Dudley. The State contends that the Defendant was not invoking his right to have counsel present during any further interrogation, but was instead merely "requesting to consult with an attorney about his consent to the collection of physical evidence and the taking of a polygraph examination." As such, the State argues that Det. Dudley was not required to cease questioning the Defendant about the murder. We respectfully disagree.

In Edwards v. Arizona, 451 U.S. 477 (1981), the United States Supreme Court held that police officers must immediately cease questioning a suspect once the suspect clearly asserts his or her right to have counsel present during custodial interrogation. See id. at 484-85. The suspect's request for an attorney during any further questioning must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994). If the accused's statement fails to meet the requisite level of clarity, the officers are not required to stop the interrogation. See id.

Our supreme court has held that "[t]he standard for a valid invocation of the right to counsel is the same under both Article I, Section 9 [of the Tennessee Constitution[2]] and the Fifth Amendment [to the United States Constitution[3]]." State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003). Whether a suspect makes an equivocal or an unequivocal request for an attorney is a question of fact. See State v. Farmer, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996). And, as set forth above, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Odom, 928 S.W.2d at 23. Here, the trial court found that "the [D]efendant's requests for an attorney were unambiguous . . . ."

The evidence before us does not preponderate against the trial court's finding that the Defendant made an unequivocal request for a lawyer during custodial interrogation by Det. Dudley. Our review of the detective's custodial interview of the Defendant indicates that, after Det. Dudley initially reviewed with the Defendant the form by which the Defendant could consent to the collection of evidence, the Defendant stated, "I'd be willing to do it, I'd like to have a lawyer at this point." (Emphasis added.) When Det. Dudley then asks if the Defendant wants to consult with an attorney or "go ahead and work with us," the Defendant reiterates, "I'll do anything, but I still think

---

[2]Article one, section nine of the Tennessee Constitution provides, in pertinent part, that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."

[3]The Fifth Amendment to the Unites States Constitution provides, in pertinent part, that "No person . . . shall be compelled in any criminal case to be a witness against himself."

-15-

I, you know, <u>like to have a lawyer with me</u>, and I'll be glad to do that." (Emphasis added.)  The Defendant is clearly and unambiguously requesting the presence of a lawyer before he cooperates any further in the investigation: which includes the custodial interrogation then being conducted by Det. Dudley.   At that point, the interrogation should have ceased.  Because  it did not, the trial court correctly suppressed all of the Defendant's statements to Det. Dudley made subsequent to his request for a lawyer.  This issue is without merit.

## II.  Statements to Detective Cooper

The Defendant moved to suppress his statements to Det. Cooper on the grounds that his invocation of his right to counsel during his interrogation by Det. Dudley remained in effect and binding upon Cooper; that the tape recordings made by Cooper during certain conversations between Cooper and the Defendant violated the Defendant's Fourth Amendment rights; that the Defendant's statements to Det. Cooper were obtained in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); that the Defendant's statements to Det. Cooper constituted an involuntary confession; and that the Defendant's statements to Det. Cooper were elicited in such a manner as to violate the Defendant's due process rights.  The trial court denied the Defendant's claims that Det. Cooper's actions violated his Fourth Amendment rights and further denied his claim that Det. Cooper violated his <u>Miranda</u> rights.  However, the trial court granted the Defendant's motion on the basis that law enforcement's conduct during the undercover operation constituted coercive misconduct violative of the Defendant's due process rights, which resulted in an involuntary, and therefore inadmissible, confession.  The State now contends that the trial court erred in granting the Defendant's motion to suppress.

As acknowledged by the Supreme Court in <u>Dickerson v. United States</u>, 530 U.S. 428 (2000), the courts of this nation have long recognized that "coerced confessions are inherently untrustworthy."  <u>Id.</u> at 433.  The federal constitution provides two bases for the requirement that a confession be voluntary in order to be admissible at trial:  the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.  <u>See id.</u>  Under the Fifth Amendment, to be admissible a confession must be "free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."  <u>Bram v. United States</u>, 168 U.S. 532, 542-43 (1897).  Due process jurisprudence determines the voluntariness of a confession by examining whether the accused's will was overborne by the circumstances surrounding his or her confession.  <u>See Dickerson</u>, 530 U.S. at 434.  "The due process test takes into consideration 'the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation.'"  <u>Id.</u> (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)).

The Supreme Court explained the repugnance of involuntary confessions in <u>Rogers v. Richmond</u>, 365 U.S. 534 (1961):

> Our decisions under [the Fourteenth] Amendment have made clear that convictions following the admission into evidence of confessions which are

involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system -- a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.

Id. at 540-41. Thus,

> The attention of the trial judge should [be] focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined . . . .

Id. at 544. Significantly, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986).

Criminal suspects in Tennessee are granted even greater protection than that afforded under the Federal Constitution: "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996). "In Tennessee, the particular circumstances of each case must be examined as a whole. A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Rather, 'coercive police activity is a necessary predicate to finding that a confession is not voluntary . . . .'" Id. (citations omitted) (quoting State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994)). Our supreme court continued: "The critical question is whether the behavior of the state's law enforcement officials was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." Id. (quotation marks omitted). That is, "[t]o render a subsequent statement involuntary, the tactics of the state actor must be so coercive as to overbear the defendant's will." Id. at 456. Thus, as this Court has previously recognized, "'A confession is involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession.'" State v. Ann Marie Thornton Kelly, No. M2001-01054-CCA-R3-CD, 2002 WL 31730874, at *15 (Tenn. Crim. App., Nasville, Dec. 5, 2002) (quoting Hill v. Anderson, 300 F.3d 679, 682 (6th Cir. 2002)).

The trial court determined that the undercover operation involving the Defendant was coercive and that the Defendant's confession to Det. Cooper was involuntary. In so doing, the trial court relied on the Supreme Court's opinion in Arizona v. Fulminante, 499 U.S. 279 (1991), in reaching its conclusion that the Defendant's confession had been coerced. In Fulminante, the defendant was incarcerated in federal prison. The Supreme Court described the Defendant as possessing low average to average intelligence; a drop-out in the fourth grade; and short and slight

in build.  During a previous incarceration, he had felt threatened by the other inmates and requested protective custody.  Once there, he had been unable to cope with the isolation and was admitted to a psychiatric hospital.

The defendant was befriended in prison by a man named Sarivola who was working as a confidential informant.  Sarivola became aware of a prison rumor that the defendant had killed his stepdaughter.  Sarivola began questioning the defendant about the murder.  The defendant denied involvement; Sarivola's superiors instructed him to continue pressing the defendant.

Sarivola approached the defendant and told him that he knew the defendant was starting to get some "tough treatment" from the other inmates because of the rumor.  Sarivola offered to protect the defendant, but only if the defendant told him about the murder.  The defendant then confessed to having killed his stepdaughter.  Prosecution by the State of Arizona ensued, resulting in the defendant's conviction.  The Arizona Supreme Court subsequently found the defendant's confession to Sarivola to have been the product of coercion and ruled it should therefore have been suppressed.  The Arizona Supreme Court stated:  "'[T]he confession was obtained as a direct result of extreme coercion and was tendered in the belief that the defendant's life was in jeopardy if he did not confess.  This is a true coerced confession in every sense of the word.'"  499 U.S. at 286 (quoting Arizona v. Fulminante, 161 Ariz. 237, 262, 778 P.2d 602, 627 (1988)).

The Supreme Court agreed:

> Although the question is a close one, we agree with the Arizona Supreme Court's conclusion that Fulminante's confession was coerced.  The Arizona Supreme Court found a credible threat of physical violence unless Fulminante confessed.  Our cases have made clear that a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient.  As we have said, "coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition."  As in Payne v. Arkansas, 356 U.S. 560 (1958), where the Court found that a confession was coerced because the interrogating police officer had promised that if the accused confessed, the officer would protect the accused from an angry mob outside the jailhouse door, so too here, the Arizona Supreme Court found that it was fear of physical violence, absent protection from his friend (and Government agent) Sarivola, which motivated Fulminante to confess.  Accepting the Arizona court's finding, permissible on this record, that there was a credible threat of physical violence, we agree with its conclusion that Fulminante's will was overborne in such a way as to render his confession the product of coercion.

499 U.S. at 287-288 (footnotes omitted) (citations omitted).

-18-

With these precedents in mind, we turn now to the trial court's findings of facts and its resulting determination that the actions of Det. Cooper and his cohorts coerced the Defendant into giving an involuntary, and therefore inadmissible, confession to murdering the victim.

Initially, the trial court found that "[t]he evidence was undisputed that at the time of the undercover operation Detective Cooper paid all of the [D]efendant's living expenses and paid for some meals and alcohol when they went out." While the record does support the finding that Det. Cooper paid for some meals and alcohol which he consumed with the Defendant, it does not support the finding that Det. Cooper paid for "all" of the defendant's living expenses. The undercover operation began on January 21, 1987. Det. Cooper did not rent the motel suite until February 2, 1987, twelve days later. While the record indicates that Det. Cooper paid all of the rent for this suite, and paid for some of the Defendant's meals and beverages, there is no proof that he paid for any of the Defendant's other living expenses. The trial court also put much emphasis on the fact that Det. Cooper paid the Defendant at least $400 for the "stolen" car transactions. However, the record also contains proof that the Defendant was gainfully employed during the undercover operation. There is no proof in the record about the amount of money the Defendant earned from his employment during this time, or how he spent it, other than that the Defendant brought alcohol into the premises he shared with Det. Cooper. We also note that, during the latter part of January, the Defendant took a five-day trip to Miami. The record does not reflect how this trip was funded, but it is clear that Det. Cooper did not accompany the Defendant there. We further note as significant that the undercover operation lasted a total of twenty-eight days, with the Defendant being arrested on Day 29. During this period, the Defendant had contact with Det. Cooper on only fourteen of the twenty-eight days. Between the rental of the motel suite on February 2 and the Defendant's arrest, there was no contact between the two men during seven of sixteen days. The evidence preponderates against the trial court's finding that the Defendant was financially dependent upon Det. Cooper.

The trial court also found that the Defendant "feared being replaced by" the confidential informant Jay Lewis, and that the Defendant "believed that if he did not tell Cooper he had committed the murder, that his access to alcohol would be shut off." Significantly, the Defendant did not testify at the suppression hearing. Rather, the trial court's findings of these "facts" were apparently based solely on the diagnostic histories collected by Drs. Smith and Caruso, who gave their opinions of the Defendant's psychological makeup based, in part, on what the Defendant told them. Ignoring the hearsay implicit in these opinions,[4] we note that Dr. Caruso also testified that the

---

[4]The Defendant's statements to Drs. Smith and Caruso, if relied upon to prove the truth of the matters asserted, were hearsay. See Tenn. R. Evid. 801(c). Tennessee Rule of Evidence 803(4) provides for the admissibility of hearsay statements rendered for purposes of medical diagnosis and treatment. See Tenn. R. Evid. 803(4); State v. McLeod, 937 S.W.2d 867, 873 (Tenn. 1996) (holding that statements made for the purpose of medical evaluation, as opposed to those made for medical treatment, are not admissible pursuant to Tennessee Rule of Evidence 803(4)). The statements made by the Defendant to Drs. Smith and Caruso were not made for the purpose of his obtaining medical treatment, but rather for evaluations. Also, our courts have generally held that the Rule 803(4) exception applies only when the statements

(continued...)

Defendant has a "personality disorder commonly associated with boasting, exaggeration, manipulation and deceitfulness." Obviously, anything the Defendant told these doctors about his subjective reactions to Det. Cooper is highly suspect. We recognize, of course, that the trial court made a specific finding about the high credibility of these two physicians. We do not second-guess the trial court's findings of their credibility or their sincerity. Nevertheless, their opinions were largely informed by the same information available to this Court: the recorded conversations between the Defendant and Cooper. Although the experts (and the trial court) repeatedly referred to Cooper's "threats" to end the relationship, the record of the transcripts of the conversations between Cooper and the Defendant does not support a finding of this "misconduct" by the detective. The record contains statements by the Defendant that belie the experts' findings. After the "fake" arrest in the bar by Det. Dudley on February 9, which triggered the first discussion between the Defendant and Cooper about the victim's murder, the Defendant volunteered to abandon the Knoxville "job" and further volunteered to make himself scarce so that Cooper would not be seen with him. The Defendant repeated his offer to leave a few days later. The record certainly does not support the trial court's conclusion that the Defendant was "afraid" of losing his relationship with Cooper.

The trial court summed up its findings and conclusions as follows:

> This court finds that the police conspired with the Georgia parole office to place the known alcoholic [D]efendant in a manipulative living situation. Although the environment was non-violent in nature, the police clearly and intentionally placed the [D]efendant in a psychologically coercive environment. Instead of helping the [D]efendant with his alcohol problem, the parole officer and the Tennessee authorities moved the [D]efendant into a situation where he was dependent on undercover officer Cooper for his place to live and his access to funds for continuous alcohol consumption. The police knew the [D]efendant was an alcoholic with an already established history of telling untrue stories to make himself seem better to those around him. The experts very credibly testified regarding the circumstances and how they were interpreted by the [D]efendant, as an alcoholic. The persistent pushing by Detective Cooper for the [D]efendant to "tell the truth" about his involvement in the murder and that Cooper would feel better if the [D]efendant had done the murder were meant to and did overbear the [D]efendant's will. The alcoholic [D]efendant believed that if he did not tell Cooper he had committed the murder, that his access to alcohol would be shut off. This court agrees with Dr. Smith that such a threat is the equivalent to a threat to life for a non-alcoholic. The [D]efendant had consistently denied any involvement until the authorities made him dependent upon them for his alcohol. Under all these circumstances, it is clear that

---

[4](...continued)

relate to a medical or physical problem. See, e.g., State v. Barone, 852 S.W.2d 216, 220 (Tenn. 1993) (holding that statements admissible pursuant to Tennessee Rule of Evidence 803(4) are limited to those concerning physical conditions as distinguished from mental or psychological injuries). For these reasons, the statements given by the Defendant to the physicians in this case were not admissible to show the truth of the matters asserted.

the crucial motivating factor behind the [D]efendant's statements were the police misconduct in question.

(footnotes omitted). With respect to the specific finding that "[t]he persistent pushing by Detective Cooper for the [D]efendant to 'tell the truth' about his involvement in the murder and that Cooper would feel better if the [D]efendant had done the murder were meant to and did overbear the [D]efendant's will," we simply do not find sufficient support in the record for this conclusion. The tape recording of the conversation between Cooper and the Defendant on February 17 indicates that the Defendant felt guilty about not telling Cooper earlier about the murder, not that he told Cooper in order to stay in Cooper's good graces. The Defendant also told Cooper that he had not confessed earlier because he had been "scared." The implication of these statements is that the Defendant told Cooper that he had killed the victim because he had come to trust Cooper and valued him as a friend, not because he was afraid of losing a free ride. Similarly, the trial court's conclusion that "the alcoholic Defendant believed that if he did not tell Cooper that he had committed the murder, that his access to alcohol would be shut off," is not supported by the record. As recognized by one of our federal courts,

> Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises. . . . Nothing is more common in the noncustodial setting of police investigations than for an undercover police officer to extract a damaging admission from a criminal suspect simply by pretending to be another criminal. The admission is useable in evidence against the suspect even though he would never have spilled the beans to the officer had he known the officer's status.

United States v. Kontny, 238 F.3d 815, 817 (7th Cir. 2001) (citations omitted).

The trial court accepted Dr. Smith's theory that the Defendant viewed the loss of his relationship with Cooper as a threat of death, hence the trial court's reliance on Fulminante. This theory was based on the fact of the Defendant's alcoholism and Cooper's alleged threats to withdraw from his partnership with the Defendant, thereby leaving the Defendant without access to the substance he (allegedly) so desperately craved. However, the Defendant had been managing without Cooper prior to January 21 and managed without Cooper for fully half of the time of the undercover operation. Moreover, it was the Defendant who repeatedly offered to withdraw from Cooper's presence and from the supposed contract hit in Knoxville. The record simply does not support the conclusion that the Defendant was dependent upon Cooper to the extent envisaged by the trial court. Rather, the record supports the conclusion that the Defendant is an opportunist who was manipulating Cooper as well as being manipulated by him. Unlike the defendant in Fulminante, the Defendant is not below-average in intelligence, not a fourth-grade drop-out, and was not subject to beatings by larger inmates from whom he could not escape. That is, the undercover operation in this case did not place the Defendant in a situation whereby, if he did not confess, he would be likely to face physical harm. Fulminante is simply not controlling of this case.

We agree with the trial court that the Chattanooga police department deceived and manipulated the Defendant. Deceit and manipulation are, however, the hallmarks of an undercover operation. While perhaps distasteful, we do not agree with the trial court that the police conduct in this case amounted to coercion sufficient to overbear the Defendant's will. The evidence preponderates against the trial court's findings in this regard. Accordingly, we reverse that portion of the trial court's order suppressing the Defendant's statements to Det. Cooper.

## CONCLUSION

We affirm the trial court's suppression of the Defendant's statements to Det. Dudley made subsequent to the Defendant's request for a lawyer. We reverse the trial court's suppression of the Defendant's statements to Det. Cooper. This matter is remanded to the trial court for further proceedings consistent with this opinion.

_____
DAVID H. WELLES, JUDGE